**MEDTRONIC, INC. and Medtronic Puerto Rico, Inc., Plaintiffs,**

v.

**DAIG CORPORATION, Defendant.**

**PACESETTER SYSTEMS, INC., Plaintiff,**

v.

**MEDTRONIC, INC. and Medtronic Puerto Rico, Inc., Defendants.**

Civ. Nos. 4–79–256, 3–83–251.

United States District Court,
D. Minnesota,
Third and Fourth Divisions.

June 24, 1985.

Robert T. Edell, Albert L. Underhill, Merchant, Gould, Smith, Edell, Welter & Schmidt, and Joseph Breimayer, Medtronic, Inc., Minneapolis, Minn., for Medtronic, Inc., and Medtronic Puerto Rico, Inc.

Malcolm L. Moore, Williamson, Bains, Moore & Hansen, Minneapolis, Minn., and Daniel J. Starks, Minnetonka, Minn., for Daig Corp.

Donald L. Cox, Mary Janice Lintner, Lynch, Sherman & Cox, Louisville, Ky., and Robert R. Meads, Sylmar, Cal., for Pacesetter Systems, Inc.

Richard Ihrig, Inc., Lindquist & Vennum, Minneapolis, Minn., for Siemens-Pacesetter, Inc.

### MEMORANDUM ORDER

LARSON, Senior District Judge.

## INTRODUCTION

The matter before the Court began in 1979 as a relatively straightforward patent infringement action. In the six years which followed, however, the matter proliferated such that almost every federal district judge in Minnesota was involved in this matter at one time or another; the matter spawned related actions in Texas and Florida which now have been stayed pending this decision or transferred to Minnesota for decision; and the matter attracted the keen attention and required the significant investment of time, money, and effort of a number of corporations in the competitive field of pacemaker pulse generators and pacemaker leads. Now, in 1985, the Court, having given its careful consideration to the matter, hopes to render a decision which will show the matter to be the straightforward patent infringement action it is, and signal the beginning of the end for this unnecessarily protracted and unduly complicated litigation.

Medtronic, Inc. and its wholly owned subsidiary Medtronic Puerto Rico, Inc. (Medtronic) commenced this patent infringement action against Daig Corporation (Daig) on May 29, 1979 in the United States District Court for the District of Minnesota. The action was assigned to Judge Harry H. MacLaughlin under Civil No. 4–79–256. Medtronic alleged that Daig had infringed the claims of its assigned United States Patent No. 3,902,501 ('501 patent) and No. 3,737,579 ('579 patent). Medtronic requested that Daig be enjoined from infringing the '501 and '579 patents and account for and pay damages which resulted from Daig's infringement. Medtronic also asserted that Daig's infringement was willful, deliberate, and intentional and requested that the damages be trebled. On July 18, 1979, Daig filed its Answer and Counterclaim and, on February 23, 1981, Daig, with leave of court, filed its Amended Answer and Counterclaim. In its Amended Answer and Counterclaim, Daig asserted the affirmative defenses that the '501 and '579 patents were invalid under 35 U.S.C. §§ 102, 103, and 112, that Medtronic was estopped by its actions in the negotiations and proceedings involving the '501 and '579 patent applications before the United States Patent and Trademark Office

(PTO), that Medtronic had misused the '501 and '579 patents in this infringement action, and that, with respect to the '501 patent, Medtronic had displayed a lack of candor with the PTO having failed to disclose the wedge tip pacemaker leads which Medtronic marketed commercially as Models Nos. 6901 and 6907. Daig sought declaratory judgment that the '501 and '579 patents were invalid. Daig also alleged that Medtronic's conduct violated federal antitrust law, 15 U.S.C. §§ 1 and 2, state antitrust law, Minn.Stat. §§ 325.8011–325.8028 (renumbered Minn.Stat. §§ 325D.49–325D.66), and constituted unfair means and methods of competition. Daig requested that Medtronic's conduct be enjoined and that Daig be awarded treble damages.

On December 16, 1980, Daig commenced a separate patent infringement action against Medtronic in the United States District Court for the District of Minnesota. The action was assigned to Judge Diana E. Murphy under Civil No. 4–80–611. Daig alleged that Medtronic had infringed its assigned United States Patent No. 4,236,529 ('529 patent) and sought injunctive relief and money damages as determined by an accounting. Medtronic filed its Answer and Counterclaim on January 12, 1981 in which it asserted the affirmative defenses of invalidity under 35 U.S.C. §§ 102, 103, and 112, file wrapper estoppel, and fraud in the procurement of the '529 patent, and sought declaratory judgment that the '529 patent was invalid. On January 13, 1981, the patent infringement actions, Civil Nos. 4–79–256 and 4–80–611, were consolidated for all pretrial purposes and trial before Judge MacLaughlin. These actions were subsequently reassigned to Judge Paul A. Magnuson upon his appointment to the federal bench on November 16, 1981.

On June 10, 1981, a petition in involuntary bankruptcy for a liquidation proceeding under Chapter 7 of the Bankruptcy Code was filed against Daig. Daig promptly converted the proceeding to a reorganization proceeding under Chapter 11 on June 16, 1981. The infringement actions, Civil Nos. 4–79–256 and 4–80–611, were stayed pursuant to the automatic stay provisions of the Bankruptcy Code. On January 22, 1982, Medtronic commenced an adversary proceeding in the United States Bankruptcy Court for the District of Minnesota in which Medtronic sought modification of the automatic stay. The matter came on for trial before the Bankruptcy Court on March 9, 1982 and the Bankruptcy Court modified the automatic stay on April 15, 1982. The Bankruptcy Court permitted Medtronic to proceed against Daig in Civil No. 4–79–256 and to defend in Civil No. 4–80–611 to obtain an infringement determination and injunctive relief, if appropriate.

Medtronic then filed a Motion for Expedited Trial Date which was denied on August 12, 1982. On October 13, 1982, Medtronic followed with a Motion for Preliminary Injunction seeking to enjoin Daig from manufacturing, using, or selling any pacemaker leads within the terms of the claims of the '501 patent. Daig responded with its Motion to Stay on November 17, 1982 asking the Court to stay the litigation between Medtronic and Daig with respect to the '501 patent pending a determination of the validity of that patent in another infringement action, *Medtronic, Inc. and Medtronic Puerto Rico, Inc. v. Intermedics, Inc.*, Civil No. G–80–295, which was then pending in the United States District Court for the Southern District of Texas. Daig, as a condition to a stay of the Medtronic litigation in Minnesota, agreed to be bound by the determination of the Intermedics litigation in Texas as to the validity of the '501 patent. On November 24, 1982, the Court denied Daig's Motion to Stay and scheduled Medtronic's Motion for Preliminary Injunction for January 10, 1983. Following a nine day hearing, the Court, on May 20, 1983, ordered Daig not to make, use, or sell silicone or other tined leads embodying the elements of Claim 1 of the '501 patent during the pendency of this action. On August 29, 1984, the Court, having found that the equities and the improved financial condition of Daig warranted lifting the injunction, vacated the preliminary injunction conditioned upon the ability and willingness of Daig to comply with

an escrowed royalty arrangement with Medtronic.

On August 21, 1981, Pacesetter Systems, Inc. (Pacesetter) commenced a declaratory judgment action against Medtronic in the United States District Court for the Central District of California. Pacesetter sought to have the '501 patent declared invalid and not infringed by Pacesetter. The action was transferred to the United States District Court for the District of Minnesota on February 11, 1983 where it was assigned to Judge Donald D. Alsop under Civil No. 3–83–251. Medtronic filed its Answer and Counterclaim on March 28, 1983 and asserted that Pacesetter had willfully, deliberately, and wantonly infringed the '501 patent. Medtronic sought injunctive relief and treble money damages. This action, having been found to be a companion case to Civil Nos. 4–79–256 and 4–80–611, was reassigned to Judge Magnuson on June 13, 1983.

Pacesetter, like Daig, filed a Motion to Stay on May 27, 1983 asking the Court to stay discovery and trial pending a final determination of the validity of the '501 patent in *Medtronic, Inc. and Medtronic Puerto Rico, Inc. v. Intermedics, Inc.*, Civil No. G–80–295, which was pending in the United States District Court for the Southern District of Texas. As a condition to a stay of the proceedings in Minnesota, Pacesetter agreed to be bound by the determination of the validity of the '501 patent in the Intermedics litigation in Texas. On August 5, 1983, Pacesetter, following a determination in the Intermedics litigation that the '501 patent was valid and infringed, withdrew its Motion to Stay. Medtronic then brought a Motion for Preliminary Injunction which was denied on August 30, 1983. Medtronic and Pacesetter later brought Cross-Motions for Summary Judgment which were denied on April 18, 1984.

The Court, having determined that the issues of patent validity and infringement in Civil No. 3–83–251 involved common questions of law and fact with the issues of patent validity and infringement in consolidated Civil Nos. 4–79–256 and 4–80–611, consolidated Civil Nos. 3–83–251, 4–79–256, and 4–80–611 for trial. The Court then ordered the trial trifurcated with the issues of patent validity and infringement to be tried to the Court first, the issues of damages relating to patent infringement to be tried to the Court next, and the issues of liability and damages relating to the antitrust and unfair competition claims to be tried to a jury last.

Trial commenced before Judge Earl R. Larson on February 14, 1985 and continued, with only the interruption of a classic Minnesota blizzard, until its conclusion on March 20, 1985. The Court heard and received evidence with respect to Claim 1 of the '501 patent only. Essentially, the consolidated actions before the Court were Civil Nos. 4–79–256 and 3–83–251. Remaining issues await trial another day. This Memorandum Order comprises the findings of fact and conclusions of law of the Court pursuant to Rule 52(a) of the Federal Rules of Civil Procedure. This Order is the product of careful and detailed attention to the witnesses and evidence presented and the numerous legal issues raised. Where conflicts existed in the testimony, and conflicts there were, facts have been found on the basis of close observation of the appearance, conduct, and demeanor of the witnesses, and scrutiny of contemporaneous documentation or exhibits, if available.

PATENT IN SUIT

At issue in this trial is the validity of United States Patent No. 3,902,501 (PX 1)[1] entitled "Endocardial Electrode." Paul Citron and Eugene A. Dickhudt are the inventors of this endocardial electrode and they assigned their interest in it to Medtronic. Their patent application was filed on June 21, 1973 and the '501 patent was issued on September 2, 1975. This endocardial electrode, or tined lead, provided a unique means of passively fixing a medical elec-

---

1. For convenient reference, the Court will use the following abbreviations:
 PX—Medtronic Exhibit

 DX—Daig Exhibit
 PSX—Pacesetter Exhibit

trode to heart tissue, particularly the trabeculae[2] of the ventricles[3] and the right atrial appendage.[4] The new lead employed a plurality of pliant nonconducting tine means adjacent to the electrode tip to cooperate with the heart tissue. The pliant nonconducting tines offered a more effective way of passively fixing the lead to heart tissue until natural fixation or fibrosis[5] could occur and without damaging the affected venal or heart tissue.[6] The '501 patent specifically claimed:

1. In an endocardial lead of the type having an electrical conductor encased in a material which is generally inert to body fluids, the conductor terminating at an exposed electrically conductive electrode tip, the improvement which comprises:

nonconducting tine means extending from said encasing material and away from said tip from a location adjacent said tip for cooperating with heart tissue, to hold the tip in position, said tine means forming a generally acute angle with said encasing material and being entirely of a pliant material having sufficient rigidity to maintain said angle when said tine means are unrestrained, but sufficiently pliant to prevent penetration of said heart tissue, said pliant material being generally inert to body fluids.

(PX 1, column 6, lines 50–66).

Claim 1 is the only claim of the '501 patent in dispute here.

Paul Citron came to Medtronic in February 1972 with a bachelor's degree and a master's degree in electrical engineering to develop an atrial pacing system. With essentially no experience in pacing, but with the background of a self-described hybrid masters program involving medical and veterinary courses in anatomy and physiology, Citron pondered his task. He studied the anatomy of the human heart, the literature involving atrial pacing, and the available technology. The study of his task made clear to him that the problem then confronting atrial pacing was twofold. First, the pacemaker or pulse generator, the device which both senses the rate and amplitude of electrical impulses of the heart and stimulates the heart with a self-generated electrical impulse to restore an acceptable heart rate, was itself a problem involving the capability of the pulse generator to sense accurately the electrical activity of the heart and to stimulate properly the heart as necessary. Second, the lead system, the means by which the pulse generator senses the electrical impulses of the heart and transmits stimulating electrical impulses to the desired location in the heart, was a problem because no reliable atrial pacing lead system existed. The absence of a reliable atrial pacing lead system, in Citron's opinion, was of paramount concern and on that problem he focused his attention and energy.

While no reliable atrial pacing system existed in 1972, a variety of epicardial or myocardial leads and endocardial or transvenous leads, commonly used in ventricular pacing, had been used in atrial pacing. Epicardial leads, which were actually attached to the outer surface or the epicardium[7] or myocardium[8] of the heart, included a screw-on lead (PX 29) and a

2. Trabeculae are lattice-like structures of small bundles of muscle fibers in the ventricular apex or the right atrial appendage.

3. The ventricles are the lower chambers of the heart which receive blood from a corresponding atrium (the upper chamber of the heart) and from which blood is forced into the arteries.

4. The right atrial appendage is the ear- or auricle-like pouch of the right atrium.

5. Fibrosis is the process by which scar tissue forms at the site of an injury to a muscle or organ of the body.

6. The Court uses the terms passive fixation and active fixation in contrast to each other. Passive fixation refers to the non-traumatic placement of a lead at a desired location in the heart, often at the trabeculae. Active fixation, on the other hand, refers to the traumatic placement of a lead at a desired location, often using a grasping, biting, pinching, piercing, penetrating, impaling, or screwing mechanism.

7. The epicardium is the thin fibrous layer covering the outside of the heart.

8. The myocardium is the middle muscular layer of the heart wall.

suture-on lead (PX 28). A screw-on lead was actively fixed within the myocardium in a corkscrew-like fashion. A suture-on lead was actively fixed to the myocardium with silk sutures. The fixation of epicardial leads required one of three significant surgical procedures, including a major thoracotomy,[9] a minor thoracotomy,[10] or a subxiphoid approach.[11] The major surgery necessary for the fixation of epicardial leads was a major disadvantage of epicardial leads because of the attendant trauma and risks of major surgery and the extended recuperation time.

Endocardial or transvenous leads, which were positioned within the heart by insertion through a vein, included a straight-shank lead, a wedge tip or flange lead (PX 30), and a helical lead. A straight-shank lead and a flange lead were inserted transvenously into the heart and passively fixed within the trabeculae of the right atrial appendage or ventricular apex where it was hoped the lead tip would remain in contact with the endocardium.[12] A helical lead was also inserted transvenously into the heart, but it involved a helically shaped barb or hook mechanism which was actively fixed to the endocardium by rotating the device. The placement or positioning of endocardial leads required a minor surgical procedure under local anesthesia which involved cannulating a vein and using a catheter through which the lead would be passed to the desired location in the heart. The relatively non-traumatic procedure and quick recovery time were significant advantages of endocardial leads. Endocardial leads, however, also had disadvantages involving acute dislodgement, where the electrode tip of the lead lost contact with the endocardium or wall of the heart, and perforation, where the electrode tip punctured the endocardium.

Citron, along with Eugene Dickhudt, a mechanical technician for Medtronic, began to design atrial lead systems. As Citron's laboratory notebook (PX 42) evidences, Citron and Dickhudt toyed with a number of lead designs in early 1972. Some of these lead designs included: the earthworm endocardial lead (PX 42, pp. 1–2) which was intended to allow both atrial and ventricular pacing through the same lead; the cyanoacrylate myocardial lead (PX 42, pp. 2 and 12–16) which envisioned literally gluing the lead to the myocardium; the barbed myocardial lead (PX 42, pp. 17 and 19) which used conductive fishhooks or barbs to fix the lead to the myocardium; the vacu-tach lead (PX 42, p. 17) which was intended to fix the fishhook lead to the myocardium of the atrium with a vacuum pump; the vena cava atrial lead (PX 42, pp. 20 and 24–25) which was a flat myocardial lead to be wrapped around the superior vena cava and secured with glue or sutures; and the double twang lead or endocardial s-a node electrode (PX 42, p. 26) which, upon positioning in the atrium, would bifurcate into two smaller J-shaped leads with electrode tips. On July 7, 1972, Citron entered in his lab notebook a sketch of "a new concept for an atrial endocardial lead" which he called the grapnel (PX 42, p. 50). Citron envisioned a flexible endocardial lead body with a skirt of a number of pliant silicone rubber tines which could be positioned in the right atrial appendage, and possibly the ventricles. Citron intended the tined skirt of the lead to extend approximately 45° from the axis of the lead body and to be positioned with a hold-down mechanism or with the tines free-standing. Dickhudt built the first prototype of the grapnel lead and Citron entered a picture of it in his lab notebook on July 13, 1972

---

**9.** A major thoracotomy, or a sternal or midline thoracotomy, involves a 10–12 inch incision in the sternum with the sternum then being spread—literally cracking open the rib cage—to allow access to the heart.

**10.** A minor thoracotomy, or a lateral thoracotomy, involves a 2–3 inch incision in the left lateral, fifth inner rib space to allow access to the heart.

**11.** A subxiphoid approach, or tunnelling technique, involves an incision over the xiphoid process, which is a small cartilaginous triangular bone of the sternum, the removal of that bone, and an incision in the diaphragm to allow access to the inferior surface of the heart.

**12.** The endocardium is the thin inner lining of the heart which covers the myocardium.

(PX 42, p. 51). The grapnel would eventually come to be known as the tined endocardial lead which Claim 1 of the '501 patent embraces.

## VALIDITY OF THE '501 PATENT

### Presumption of Validity

■ In order to be patentable, an invention must satisfy three explicit statutory conditions: (1) utility (35 U.S.C. § 101); novelty (35 U.S.C. § 102); and (3) nonobviousness (35 U.S.C. § 103). *Graham v. John Deere Co.*, 383 U.S. 1, 12, 86 S.Ct. 684, 691, 15 L.Ed.2d 545 (1966).[13] A patent once issued, however, is presumed valid and the burden of establishing that a patent is invalid rests on the party asserting such invalidity. 35 U.S.C. § 282. Section 282 "mandates not only a presumption shifting the burden of going forward in a purely procedural sense, but also places the burden of persuasion on the party who asserts that the patent is invalid." *Solder Removal Co. v. United States International Trade Commission*, 582 F.2d 628, 632 (C.C.P.A.1978) (footnote omitted). That burden, which always remains with the party asserting invalidity, is to persuade the Court of invalidity by clear and convincing evidence. *American Hoist & Derrick Co. v. Sowa & Sons*, 725 F.2d 1350, 1360 (Fed.Cir.), *cert. denied*, —— U.S. ——, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984). The only question for the Court is whether that burden has been successfully carried. *Id.*

■ When the party asserting the invalidity of a patent relies only on the prior art which the PTO examiner considered, that party has the added burden of overcoming the deference due to the PTO. The PTO, through examiners of some expertise in scrutinizing and interpreting prior art references and familiarity with the level of skill in the art, is presumed to have properly performed its function of issuing only valid patents. The added burden on the challenger in this situation is to show that

the PTO erred in granting the patent. *Id.* at 1359–60.

■ When the party asserting invalidity offers prior art or other evidence which the PTO examiner did not consider, the deference due the PTO is reduced or eliminated because the PTO has not applied its expertise to this art and the Court, consequently, is not faced with having to disagree with the PTO. *Id.* The introduction of prior art which the PTO examiner did not consider does not weaken or otherwise affect the presumption of validity. The burden of persuasion remains clear and convincing evidence. That burden, however, may be met more easily when the prior art which was not considered is more pertinent than the cited art. *Lindemann Maschinenfabrik v. American Hoist and Derrick*, 730 F.2d 1452, 1459 (Fed.Cir. 1984). Whether the uncited art is more pertinent turns on its relationship to the claimed invention. Pertinence is the touchstone with respect to the uncited art. A presumption that the examiner considered the uncited art because it is found in the classes and subclasses which the examiner searched is, therefore, unnecessary. To the extent that the examiner's consideration of uncited art is material, the challenger incurs the additional burden of showing that the uncited prior art was not considered. The challenger can meet this added burden by showing that the uncited art is more pertinent than the cited art. Conversely, the patentee can thwart the challenger in this regard by showing that the pertinence of the uncited art is equal to or less than that of the cited art. *Id.* at 1460.

### § 102

■ Section 102 provides in relevant part that:

A person shall be entitled to a patent unless—

---

**13.** Daig and Pacesetter do not seriously dispute the utility of the tined endocardial lead which Claim 1 of the '501 patent embraces, and the Court notes that the evidence supports such a finding of utility. Rather, Daig and Pacesetter challenge the novelty of the '501 patent under §§ 102(a), (b), and (g), and the nonobviousness of the '501 patent under § 103. Additionally, Daig and Pacesetter challenge the validity of the '501 patent under § 112.

(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, or

(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States, or

\* \* \* \* \* \*

(g) before the applicant's invention thereof the invention was made in this country by another who had not abandoned, suppressed, or concealed it. In determining priority of invention there shall be considered not only the respective dates of conception and reduction to practice of the invention, but also the reasonable diligence of one who was first to conceive and last to reduce to practice, from a time prior to conception by the other.

35 U.S.C. § 102.

A party asserting that a patent claim is anticipated under § 102 must establish that "each element of the claim in issue is found, either expressly described or under principles of inherency, in a single prior art reference, or that the claimed invention was previously known or embodied in a single prior art device or practice." *Kalman v. Kimberly-Clark Corp.*, 713 F.2d 760, 771 (Fed.Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 1284, 79 L.Ed.2d 687 (1984). The anticipating reference need not "teach" what the patent in suit teaches. Rather, it is sufficient that the claim being challenged "read on" something disclosed in the reference, i.e., all limitations of the claim are found in the reference or are "fully met" by it. *Id.* at 772. The Court, in considering anticipation, must first identify the elements of the claim in issue, determine the meaning of those elements in light of the specification and prosecution history, and identify corresponding elements disclosed in the allegedly anticipating reference. *Id.* at 771; *Lindemann Maschinenfabrik v. American Hoist and Derrick*, 730 F.2d 1452, 1458 (Fed.Cir. 1984).

When a party asserts that a prior use anticipates a patent claim under § 102(a) or (b), that party must also establish that such a use was of a complete invention, *i.e.*, conceived and reduced to practice, and public. *Coffin v. Ogden*, 85 U.S. (18 Wall.) 120, 124, 21 L.Ed. 821 (1873); *International Glass Company v. United States*, 408 F.2d 395, 402, 187 Ct.Cl. 376 (1969). Reduction to practice requires that an invention be sufficiently tested to demonstrate that it will work for its intended purpose. *Kimberly-Clark Corp. v. Johnson & Johnson*, 745 F.2d 1437, 1444 (Fed.Cir.1984) (citing *Barmag Barmer Maschinenfabrik AG v. Murata Machinery, Ltd.*, 731 F.2d 831, 838 (Fed.Cir.1984)). Reduction to practice does not require that the invention, when tested, be in a commercially satisfactory stage of development. *Barmag Barmer Maschinenfabrik AG v. Murata Machinery, Ltd.*, 731 F.2d 831, 838 (Fed.Cir.1984). To determine whether a public use has occurred requires consideration of all the circumstances surrounding the use. *TP Laboratories, Inc. v. Professional Positioners, Inc.*, 724 F.2d 965, 971–72 (Fed.Cir.) *cert. denied,* —— U.S. ——, 105 S.Ct. 108, 83 L.Ed.2d 51 (1984). Circumstances surrounding the use to be considered include whether payment is made for the device, whether a user agreed to use secretly, whether records were kept of progress, whether persons other than the inventor conducted tests or experiments, how many tests or experiments were conducted, and how long the testing period was in relationship to tests of other similar devices. *Id.* at 972. That a non-secret use of the device was made or that the device was not hidden from view is not *ipso facto* public use. *Id.*

Where a party asserts that a prior invention anticipates a patent claim under § 102(g), that party must establish that such an invention is complete, *i.e.*, conceived and reduced to practice, and not abandoned, suppressed, or concealed. *Coffin v. Ogden*, 85 U.S. (18 Wall.) 120, 124, 21 L.Ed. 821 (1872); *International Glass Company v. United States*, 408 F.2d 395, 402, 187 Ct.Cl. 376 (1969). If the invention

is not complete or reduced to practice, whether it was abandoned, suppressed, or concealed matters not for the inventor has nothing to offer or disclose to the public. *Id.* If the invention is complete or reduced to practice, however, it may be deemed abandoned, suppressed, or concealed if, within a reasonable time after completion, no steps, such as filing a patent application, describing the invention in a publicly disseminated document, or using the invention publicly, have been taken to make the invention publicly known. *International Glass Company v. United States,* 408 F.2d 395, 403, 187 Ct.Cl. 376 (1969).

Claim 1 of the '501 patent may be stated in terms of its elements as follows:

1. In an *endocardial lead* of the type having an *electrical conductor encased in a material which is generally inert to body fluids,* the conductor terminating at an *exposed electrically conductive electrode tip,* the improvement which comprises:

nonconducting tine means

extending from said encasing material and away from said tip from a location adjacent said tip

for cooperating with heart tissue, to hold the tip in position,

said tine means forming a generally acute angle with said encasing material and being entirely of a pliant material having sufficient rigidity to maintain said angle when said tine means are unrestrained,

but sufficiently pliant to prevent penetration of said heart tissue,

said pliant material being generally inert to body fluids.

Claim 1 contemplates an improvement to an endocardial lead which increases the reliability of electrode securement and reduces the incidence of perforation. The improvement consists of the addition of a plurality of nonconductive tine means to the endocardial lead. The tine means extend from the lead body or encasing material and away from the tip of the lead. The tine means are located adjacent or near the tip of the lead and form an acute angle, such as 45°, with the lead body. The tine

means are made entirely of a pliant material inert to body fluids, such as silicone rubber or polyurethane, which is sufficiently rigid to maintain the angle of the tine means when they are unrestrained, but sufficiently flexible to avoid penetration of heart tissue upon insertion and placement. The tine means are designed to hold the lead tip in electrical contact with heart tissue through cooperation with heart tissue, particularly trabeculae of the right atrial appendage or ventricles, until natural fixation or fibrosis has occurred (*See* PX 1, Figure 1). The elements of Claim 1 find support and correspondence in the specification and prosecution history of the '501 patent.

Pacesetter contends that the '501 patent was anticipated under § 102 in at least three ways: 1) anticipation by publication; (2) anticipation by prior use; and (3) anticipation by prior invention. Daig offers no serious argument for anticipation under § 102. According to Pacesetter, a barbed lead falling squarely within each element of Claim 1 of the '501 patent was disclosed in a 1969 printed publication, *Pacemaker Electrode,* 4 Bio-Medical Engineering 383 (August 1969) (PSX 10b). This reference is prior art for purposes of § 102 because it is undisputed that the reference was published before the invention of the tined lead (July 7, 1972) and more than one year before the application for the '501 patent (June 21, 1973). This reference, which was but a blurb relating to new products in medical instrumentation, is reprinted in its entirety as follows:

PACEMAKER ELECTRODE

Vitatron Medical N.V. of Holland has announced a new unipolar intracardiac catheter electrode, type MIP 135, for long term stimulation by implanted pacemakers. It can be used with all Vitatron pacemakers as well as with most other types of pacemaker including on-demand types.

The new electrode consists of a platinumiridium electrode tip and a helically coiled lead of Elgiloy, insulated by a tube of silicone rubber. A stainless steel stylet can be placed in the lumen of the

helical coil for the introduction of the catheter electrode.

The tip is fitted with a small barbed silicone ring to prevent dislocation in the critical postoperative period.

(PSX 10b, p. 383).

To Pacesetter, this Vitatron reference discloses each element of Claim 1 of the '501 patent (*See* PSX 8i).

 This reference discusses an improvement to an endocardial electrode which is designed to reduce dislodgement in the critical postoperative period and which is embodied in the Vitatron MIP 135. The improvement consists of the electrode tip being fitted with "a small barbed silicone ring." For Pacesetter, the Vitatron improvement is clearly synonymous with the improvement of the '501 patent. For the Court, however, the Vitatron improvement, as both stated and pictured (*See* PSX 10b, pp. 382 and 383), is ambiguous. This ambiguity precludes the Vitatron reference from anticipating Claim 1 of the '501 patent because the Court cannot satisfactorily determine whether each element of Claim 1 is found in the reference.

While some elements of Claim 1 are found in the Vitatron reference, such as an endocardial lead (a unipolar intracardiac catheter electrode, type MIP 135), with an electrical conductor (a helically coiled lead of elgiloy), encased in a material inert to body fluids (insulated by a tube of silicone rubber), and an exposed electrically conductive electrode tip (a platinum-iridium electrode tip), not all elements of Claim 1 are clearly found in the reference, particularly nonconducting tine means extending away from the lead body at an acute angle for cooperating with heart tissue to hold the tip in position. Because each element of Claim 1 cannot be found in the Vitatron reference, the Vitatron reference does not anticipate Claim 1 of the '501 patent.

Pacesetter focuses on the phrase "a small barbed silicone ring" as the Vitatron embodiment of the Claim 1 concept. In this phrase, Pacesetter finds each element of Claim 1. But the phrase "a small barbed silicone ring" alone discloses simply three adjectives loosely modifying a soli-

tary noun. Read literally, the phrase describes a ring which is small, which is barbed, and which is silicone. The elements of Claim 1 are not apparent in this phrase. Read in the light of hindsight, however, the phrase gains the allure of being a rather convenient and shorthand description of a tined endocardial lead such as that of Claim 1. This description, according to Pacesetter, must surely anticipate the tined endocardial lead as disclosed in Claim 1. Yet, it is hindsight, as Pacesetter's evidence on this point illustrates, which informs the phrase "a small barbed silicone ring" and allows one to "read on" the elements of Claim 1 in the Vitatron reference. Hindsight, however, has no place in considering anticipation and without it the Vitatron reference remains ambiguous and incapable of anticipating Claim 1.

Perhaps telling of the weakness of the Vitatron reference as an anticipating publication was Medtronic's introduction of clearer photographs of Vitatron leads which embodied "a small barbed silicone ring." Because Pacesetter's witness Dr. Tomlinson was unable to say whether the photograph of Vitatron MIP 135 in the Vitatron reference disclosed a tined endocardial lead (PSX 10b, p. 382), Medtronic sought to introduce a clearer picture as found in a Vitatron MIP 135 sales brochure (PX 208). Although Dr. Tomlinson found the photograph inadequate for purposes of determining whether the lead had tine means or similar projections, the Court finds the photograph sufficient to establish that the Vitatron MIP 135 did not have tine means as disclosed in Claim 1. The Court, in fact, finds the photograph sufficiently clear to establish that the Vitatron MIP 135 was a flange or wedge tip lead. Medtronic also introduced, over Pacesetter's strenuous objection, other Vitatron sales brochures which used the phrase "a small barbed silicone ring" to describe a flange or wedge tip lead (*See, e.g.,* PX 207). The Court is of the opinion that the phrase "a small barbed silicone ring" as used in connection with Vitatron endocardial leads does not refer to the improvement dis-

closed in Claim 1 of the '501 patent. Rather, the phrase "a small barbed silicone ring" as used in the printed publications of 1969 referred to a common flange or wedge tip endocardial lead.

Pacesetter also contends that barbed leads fulfilling each element of Claim 1 of the '501 patent existed in August 1971 before the invention of the tined lead (July 7, 1972) and more than one year before the application for the '501 patent (June 21, 1973). According to Pacesetter, Dr. Schulman conceived the idea of a barbed pacemaker lead in 1970 and reduced the barbed lead to practice and publicly used it by August 1971. Pacesetter offered the testimony and related exhibits of Joseph Schulman, James Beazell, Gerald Adomian, Harry Fletcher, Leslie Lettau, Mary Craig, and Albert Rambo to show prior use and prior invention of a barbed or tined endocardial lead. This evidence, however, was largely without the support of contemporaneous and reliable notes, reports, photographs, or other documents, let alone the claimed barbed lead itself. Often the evidence was unclear, obscure, inaccurate, contradictory, inconsistent, and generally wanting of credibility. Nevertheless, Dr. Schulman and others at Pacesetter believe that they

actively researched and experimented with the barbed lead through 1974. This prior invention and public use of a barbed lead, Pacesetter concludes, clearly anticipates Claim 1 of the '501 patent.

Because Pacesetter offered mainly the unsupported oral testimony of witnesses to show prior use and invention, the Court views such testimony with suspicion and subjects it to close scrutiny. *E.I. Du Pont de Nemours v. Berkley & Co., Inc.*, 620 F.2d 1247, 1261 (8th Cir.1980). The Court considers the sufficiency of this testimony in the light of various factors which include: (1) the delay between the event and trial; (2) the interest of the witnesses; (3) contradiction or impeachment; (4) corroboration; (5) the witnesses' familiarity with details of the alleged prior structure; (6) the improbability of prior use considering state of the art; (7) the impact of the invention on the industry; and (8) the relationship between the witnesses and the alleged prior user. *Id.* at n. 20.[14]

Joseph Schulman went to work for Standard Scientific Systems, Inc., now Pacesetter Systems, Inc., in April 1969 after receiving his doctorate in biology from the University of California at Los Angeles

---

**14.** That the unsupported oral testimony of Pacesetter's witnesses with respect to the anticipation of the '501 patent is "open to grave suspicion" derives from the observations of the Supreme Court in *The Barbed Wire Patent*, 143 U.S. 275, 12 S.Ct. 443, 36 L.Ed. 154 (1892).

> We have now to deal with certain unpatented devices, claimed to be complete anticipation of this patent, the existence and use of which are proven only by oral testimony. In view of the unsatisfactory character of such testimony, arising from the forgetfulness of witnesses, their liability to mistakes, their proneness to recollect things as the party calling them would have them recollect them, aside from the temptation to actual perjury, courts have not only imposed upon defendants the burden of proving such devices, but have required that the proof shall be clear, satisfactory and beyond a reasonable doubt. Witnesses whose memories are prodded by the eagerness of interested parties to elicit testimony favorable to themselves are not usually to be depended upon for accurate information. The very fact, which courts as well as the public have not failed to recognize, that almost every important patent, from the cotton gin of Whit-

ney to the one under consideration, has been attacked by the testimony of witnesses who imagined they had made similar discoveries long before the patentee had claimed to have invented his device, has tended to throw a certain amount of discredit upon all that class of evidence, and to demand that it be subjected to the closest scrutiny. Indeed, the frequency with which testimony is tortured, or fabricated outright, to build up the defence of a prior use of the thing patented, goes far to justify the popular impression that the inventor may be treated as the lawful prey of the infringer.

*Id.* at 284–85, 12 S.Ct. at 447.

These observations remain valid in principle today and are particularly appropriate in this case. While the Court intends in no way to require proof of prior use beyond a reasonable doubt, as was suggested in *The Barbed Wire Patent*, the Court will accept nothing less than proof of prior use by clear and convincing evidence. *See Trans-World Manufacturing Corp. v. Al Nyman & Sons, Inc.*, 750 F.2d 1552, 1559 (Fed.Cir.1984) (citing *E.I. Du Pont de Nemours & Co. v. Berkley & Co.*, 620 F.2d 1247, 1261 (8th Cir.1980) ).

(UCLA). With the financial backing of Al Mann, Schulman rented a small garage facility in Van Nuys, California for Standard Scientific, ordered materials, parts, and testing equipment, and set out to develop a commercially feasible rechargeable pacemaker or pulse generator. The rechargeable pacemaker, not the pacemaker lead, was the primary interest of Schulman and Pacesetter during Pacesetter's early years, including 1970–72. All research and experimental efforts were directed primarily to the rechargeable pacemaker.

Schulman believes that he first saw an endocardial lead with silicone rubber tines or barbs when he made a prototype of such a lead in 1970. He described the barbs as being soft and flexible so that when the lead was inserted in the vein the barbs would fold down along the lead body, yet rigid enough that when the lead reached the heart the barbs would pop back out to their original position. In this way, the barbed lead would become entangled with the trabeculae in the ventricle and less likely to dislodge within the first two or three days of implantation. Schulman contends that he came up with this tined lead design in response to the problem of lead dislodgement. Yet this contention strikes the Court as rather disingenuous because Schulman testified, contrary to his deposition testimony of November 8–10, 1983, that in 1971 and 1972 he considered dislodgement not to be a serious problem. He, in fact, characterized dislodgement to be more like an infection or similar nuisance, but certainly not a serious problem.[15]

Nevertheless, Schulman told of building two different styles of barbed leads prototypes. He described one style of barbed leads as a cloverleaf. The cloverleaf lead had flattened silicone rubber barbs which were petal-like and placed near the electrode tip at either a 90° or 75° angle (*See* PSX 114(3) and (4); *See also* PSX 8b). He described another style of lead as having between two and six tubular barbs which were longer and at a sharper angle, maybe

45°, to the lead body (*See* PSX 114(1) and (2)). Schulman provided a crude sketch of his barbed lead prototypes (PSX 114). These prototype leads were handmade by cutting the barbs from room temperature silicone rubber with an Exacto knife and gluing them to an existing commercial endocardial lead with silicone adhesive. He remembers the cloverleaf lead as being the better quality handmade lead because the flattened barbs or petals were easier to slice from silicone rubber with a knife.

After building the prototype barbed leads, Schulman tested them in the hearts of living dogs. While Schulman believes that 20 barbed leads were implanted in dogs in 1971, he cites the dog James as being the first recorded implant of a barbed lead. He remembers implanting a barbed lead in James on August 24, 1971 at Harbor General Hospital in Los Angeles with Dr. Criley, the Chief of Cardiology of Harbor General, and James Beazell, the laboratory supervisor. James received a barbed endocardial lead of the cloverleaf variety. Schulman is able to recall the August 24, 1971 implant date of James because of his personal handwritten record of such dog implants (PSX 48). He recalls that a barbed lead was implanted in James because another personal implant record (PSX 35) shows that the purpose of the James implant was "a new lead design." "New lead design" meant barbed lead to Schulman.

The Court, however, wonders whether Schulman's memory and records are perhaps deficient. Neither of these records was prepared contemporaneously with the implant of James. Rather, these records were prepared well after the implant of James. While Schulman believed PSX 48 to have been prepared on February 5, 1973, it was clearly shown that PSX 48 was prepared sometime much later. Similarly, while Schulman believed his notation of "new lead design" in the purpose column of PSX 35 to have been made shortly after

---

**15.** If dislodgement was such an insignificant problem to Schulman, what, then, prompted him to build a prototype of a tined lead and why would he so divert his energies from the development of his precious rechargeable pacemaker?

November 26, 1973, it was shown that the notation to PSX 35 could possibly have been made in 1974. Documents and records related to PSX 48 and 35 were also shown to be flawed with numerous inconsistencies, ambiguities, and contradictions. "New lead design," which keyed the barb lead to the James implant in Schulman's mind, was also shown to refer to leads other than barbed leads. For example, Schulman admitted that "new lead design" also referred to a flange lead with a screw-in connector which was being developed at Pacesetter in 1971 and which Schulman sketched for the Court (*See* PX 206; *See also* PX 209). In no Pacesetter record is a structure referred to as a "new lead design" clearly shown to be a barbed lead. Supporting documentary evidence, contemporaneous or otherwise, is completely lacking with respect to Schulman's testimony of a barbed lead implant in James in August 1971.

James Beazell offered his oral testimony to corroborate Schulman's recollection that a barbed lead had been implanted in James in 1971. Beazell, who has a master's degree in physiology from UCLA, was the supervisor of the cardiology research laboratory at Harbor General Hospital in the early 1970's when Schulman and Dr. Criley were working on the rechargeable pacemaker. While an employee of Harbor General, Beazell worked closely with Dr. Criley and Schulman in the study and development of the rechargeable pacemaker, especially implants and animal testing. Beazell later became a consultant for Schulman and eventually a full-time employee of Pacesetter. In connection with the pacemaker development, Beazell recalled at least three types of barbed leads. First, he remembered an harpoon- or anchor-shaped barbed lead (*See* PSX 103(a)). The second type of barbed lead, he recalled, had four or more silicone rubber projections coming off the lead body at an acute angle in a spiral fashion (*See* PSX 103(b)). The third type of barbed lead, which was developed much later than the first two barbed leads, was a cloverleaf or umbrella tip lead (*See* PSX 103(c); *See also* PSX 8b). Beazell provided a rough sketch of these barbed leads (PSX 103) for the Court. All of these leads had an electrically conductive tip with soft pliant silicone rubber barbs at an acute angle and away from the lead tip.

Beazell believed that all three types of these barbed leads had been implanted in dogs in the early 1970's. He remembered personally implanting the first barbed lead in James in August 1971 at Harbor General Hospital. The implanted barbed lead was handmade and was either harpoon-shaped or spiral-fashion (*See* PSX 103(a) and (b)). It was not, in direct conflict with Schulman's recollection, a cloverleaf barbed lead because the cloverleaf lead was not developed and implanted until some years later, possibly 1973 or 1974. Beazell remembered that James was implanted with a barbed lead in August 1971 with reference to one of his implant records (*See, e.g.,* 56, 57 and 58). The implant records had both the implant date for James of August 24, 1971 and the notation "new lead design" which meant barbed lead to Beazell. None of the implant records, however, was contemporaneous with the James implant. Beazell, in fact, had no contemporaneous records of any implant of any barbed lead before June 21, 1973. He admitted that the records for James had been lost and had to be reconstructed. Beazell also admitted that these records were often annotated and information, such as dates, changed. Because Beazell's testimony lacks sufficient contemporaneous documentation and because it raises conflicts with Schulman's testimony, Beazell's testimony falls short of corroborating Schulman's testimony with respect to prior use of a barbed lead.

Gerald Adomian offered his account of the microscopic analysis of dog hearts with Schulman's barbed leads to corroborate Schulman's and Beazell's testimony about barbed leads in dogs in the early 1970's. Adomian is a research scientist with a doctorate in biological sciences from UCLA. He specializes in morphology and is expert with both light and electron microscopes. In December 1971, Schulman approached Adomian with respect to evaluating leads implanted within a couple of dog hearts.

Schulman was concerned primarily with whether the leads were penetrating the wall of the dog hearts. Adomian states that he is well able to remember the events of 1971–72 for three reasons. First, he was defending his doctoral dissertation in January 1972 and, because of his dissertation defense, Adomian was not immediately able to accommodate Schulman in December 1971. Second, Adomian remembers the events of December 1971 because he believes that, after talking to Schulman and considering the problems and difficulties of implanting a pacemaker lead in the heart, he came up with an "interesting" idea of putting barbs at the end of a pacemaker lead.[16] Third, Adomian remembers December 1971 because it was the first time he had ever seen, let alone analyzed, pacemaker leads in an animal heart. He had no previous experience of any kind with pacing.

Adomian examined the two dog hearts from Schulman near the end of January 1972. He recalled that the leads in the dog hearts had a conductive wire covered with a polymer ending at an exposed tip. The leads also had four or five flexible silicone rubber barbs near the tip but pointing away from the tip at a 30° to 45° angle. The barbs were pliant yet rigid enough to maintain the angle to the lead body when unrestrained. Adomian believed that, in view of the fibrotic process which surrounded portions of the lead tip, that the leads had been implanted in the hearts of living animals for about three months. He did not observe or participate in the lead implants in the living dogs, nor did he see the leads connected to a pulse generator and operating. Unfortunately, Adomian has no written report regarding these barbed leads, no notes of his examination of the dog hearts, no photographs of the leads or the examination, no documents in reference to the leads or the examination, and no tangible evidence of any kind relating to Schulman's barbed leads or the ex-amination of January 1972. Essentially, Adomian offers the Court completely unsupported oral testimony to corroborate the inadequately supported oral testimony of Schulman and Beazell. Adomian's testimony, like Beazell's testimony, fails to corroborate sufficiently Schulman's testimony with respect to prior use of a barbed lead.

Albert Rambo also offered his oral testimony to corroborate Schulman's account of a prior use of a barbed lead in 1971. Rambo joined Pacesetter in July 1971 as an engineering aide whose duties included electroforming, electroplating, and drafting. He remembered that Schulman conducted several in-house classes for Pacesetter employees in which the various aspects of pacing were discussed. Rambo recalled Schulman talking about a four-barbed lead which was designed to become entangled with the trabeculae. Sometime between July 1971 and May 1972, Rambo remembers, Schulman asked him to photograph a barbed lead. This bipolar lead had a conductor covered with a rubbery material and extending from the lead body and away from the tip at a 45° angle were four barbs of the same rubbery material. The barbs were pliant and flexible. Rambo provided a sketch of the lead which he photographed (*See* PSX 108). Rambo photographed the lead with a tripod-mounted Polaroid camera with a microscope adapter. He returned the lead with the photographs to Schulman. Rambo thinks Schulman put the photographs in an engineering notebook and does not know what Schulman did with the lead.

Rambo also remembers Beazell bringing Schulman a lead still connected to the pulse generator. Schulman had Rambo photograph this lead which differed from the previous lead only in that it was unipolar and had two barbs as opposed to four barbs. Rambo sketched the second lead (*See* PSX 109). Again, Rambo returned the lead and the photographs to Schulman and,

---

**16.** Curiously, Adomian mentioned his "interesting" idea of a barbed lead for the first time at trial. It is also curious that Adomian, with no previous experience in pacing or pacemaker leads, was able to come up with this idea in 1971 after a brief conversation with Schulman which dealt primarily with lead penetration of heart tissue. To Adomian's disappointment, however, the dog hearts which Schulman delivered contained leads similar to his idea.

again, Schulman put the photographs into an engineering notebook. Rambo does not know what Schulman did with the lead or pulse generator. Rambo photographed no other pacemaker leads for Schulman while at Pacesetter.

Rambo never saw these barbed leads implanted in a dog or human heart. He, in fact, does not know if these leads were ever used. While Rambo is certain that Schulman put the photographs of the leads into a blue spiral binder engineering notebook, he does not know where that notebook is today and it was not produced at trial. Rambo's testimony comes closest to corroborating Schulman's testimony. Yet Rambo's oral testimony remains unsupported and has failed to convince the Court that Schulman was responsible for a prior use or invention of a barbed lead in 1971.

Pacesetter, in addition to the oral testimony of its witnesses, offered what it considered to be tangible evidence of barbed or tined leads existing before the conception of a tined lead as illustrated in the '501 patent. Pacesetter introduced a single cavity barbed lead mold (PSX 9a) which Les Lettau made at the direction of Harry Fletcher in the Spring of 1972. Pacesetter also introduced the testimony of Schulman, Fletcher, Lettau, Rambo, and Craig to establish the existence and use of a barbed lead mold in 1972. But the testimony with respect to the barbed lead mold, like the testimony with respect to Schulman's conception, construction, and implantation of the barbed lead, is unclear and inconsistent.

Harry Fletcher came to Pacesetter in March 1971 as an engineer of sorts. Fletcher's main job in March 1971 was to develop a lead winding machine, but he also remembers working with Schulman on the development of the lead body. Fletcher recalled that at this time Schulman had

spoken to him of developing a lead that would not slip inside the heart of a dog. Schulman designed such a lead styled as a barbed lead for which Fletcher made an aluminum mold. From this mold, Fletcher believes, a couple of dozen prototype barbed leads were made. The lead was coiled wire in a silicone rubber insulation ending in an electrically conductive tip. Extending from the lead body and away from the lead tip at an angle of 30° were soft, pliant silicone rubber barbs. Fletcher sketched this barbed lead (PSX 94). Fletcher also recalled that about 15 barbed leads were made in 1971 at an outside molding company with a transfer mold because Pacesetter did not have transfer molding equipment at that time. He believes that all these leads were implanted in dogs, but he himself witnessed only one implant with Schulman and Beazell in late Summer or early Fall 1971.

Fletcher recalled that in February 1972 Les Lettau came to Pacesetter to do machine work, including making molds. In early 1972, at Fletcher's direction, Lettau made a single cavity barbed lead steel mold (PSX 9a). From this mold were produced two-barbed leads which were similar to PSX 8a. The leads produced had a silicone rubber body ending in an electrically conductive tip. Coming off the lead body at an acute angle were silicone rubber barbs which appeared to hold their shape when unrestrained. Fletcher first saw the single cavity steel mold (PSX 9a), which Lettau made, in March 1972. At that time, the mold, which Fletcher sketched (PX 163), was a transfer mold with two sprues (B and C) and two gates (D and F) serving the main channel or cavity of the mold.[17] Three or four days after receiving this mold from Lettau and before ever using the mold, Fletcher ordered that it be mod-

---

**17.** A transfer mold is, just as its name indicates, a mold into which material is transferred or injected. A pot with material, such as silicone rubber, is positioned on top of the mold and then heated. When the material reaches the appropriate temperature, a ram comes down into the pot and forces the heated material into the mold through the sprues. Sprues are holes in the vertical plane of the mold which provide access for material from outside to inside the mold. The material travels through the sprues into the gates. Gates are small channels in the horizontal plane and parting line of the mold which carry the material from the sprues to the main cavity of the mold. From the gates, the material passes into the cavity of the mold and is cured.

ified. Two more gates (green lines) were added. Because Fletcher could not find an outside firm to do the transfer molding and because Pacesetter did not then have the facilities to do transfer molding, Fletcher had Lettau convert the mold into a compression mold.[18] To convert the mold to a compression mold, the channel or cavity of the mold was extended the length of the mold, the sprues (B and C) and the gates (D and F) were plugged, and the two remaining gates were enlarged to form a barb. Basically, the mold evolved from these two configurations of a transfer mold and compression mold.

After the mold was completed sometime in 1972, Fletcher made a few leads with it. He would take an available commercial lead and center it in the mold so that the ring electrode of the lead rested in the little widening or groove just behind the plugged sprues. He then would put a silicone compound in the cavity, close the mold, and heat it up. Fletcher believes he made leads in this manner and similarly instructed others at Pacesetter. He never observed any of these leads being implanted, nor did he see any test results of these leads. Fletcher, in fact, has no knowledge of whether these leads were ever implanted in a dog.

Leslie Lettau went to work for Pacesetter in February 1972 as a machinist. His first project at Pacesetter was to build an aluminum mold. He built a single cavity four-barbed lead aluminum mold. Lettau's next project was to build a single cavity two-barbed steel mold (PSX 9a). He remembers this mold because he began the mold at the Pacesetter facility on Keswick in Van Nuys and completed it at the new Pacesetter facility in Sylmar in mid-May 1972. This mold, he assumed, was used to produce a two-barbed lead much the same as PSX 8a, but he never actually made a lead with the mold, nor did he see anyone else make a lead with the mold.

When Lettau first made the mold at the Van Nuys facility, it was a compression mold with a single main channel and two

small channels to form barbs (*See* PX 199; *See also* PSX 111(1) and 113). The mold was tried in that form and then he was ordered to convert it to a transfer mold. To convert the mold to a transfer mold, he drilled two sprues (A), two gates (B), and two barb cavities (C) (*See* PX 200; *See also* PSX 111(2) and 113). Lettau gave the transfer mold to Fletcher who soon returned it to Lettau to be reconverted to a compression mold. To reconvert the mold to a compression mold, Lettau effectively had to reorient the mold. He plugged the two sprues (black), filled in the gates and barb channels (green), cut two new barb channels (C), widened the area for the ring electrode placement (A), and drilled three vent holes (1, 2, 3) in the main cavity (*See* 201; *See also* PSX 111(3) and 113). For Lettau, the two-barbed lead steel mold evolved from three configurations.

Mary Craig began working for Pacesetter in January 1973 as a lead person. As a lead person, Craig instructed other employees how to build the mechanical part of the lead. She remembers from January 1973 a number of leads, including a two-barbed lead. The barbed lead had a coil conductor encased in silicone rubber ending in a metal tip assembly. The silicone rubber barbs extended from the lead body away from the tip at approximately a 30° to 45° angle. Craig did not see the two-barbed lead mold (PSX 9a) until June 1973 when she was promoted to supervisor of the leads department. During the Summer of 1973, the two-barbed lead mold was used under her supervision to produce barbed leads. Craig believed that in this time approximately 100 barbed leads were made. At the end of the Summer of 1973, she gave the mold to the engineering department. Craig did not see the mold again until she was asked to make a barbed lead (PSX 8a) for the purposes of this litigation in November 1983 and January 1985.

In using the two-barbed lead in the Summer of 1973, just as in November 1983 and January 1985, Craig stated that the techni-

---

**18.** A compression mold is a mold in which material, such as silicone rubber, is placed, often by hand. The two halves of the mold are then combined, pressed, and heated. The molding material is then allowed to cure.

cian filled the main cavity of the compression mold halves with silicone rubber and placed the existing commercial lead into the cavity. The commercial lead, however, was positioned with the ring-tip electrode in the relief area rather than the main cavity. The mold was then closed and pressed. After removing the mold, the lead was taken from the cavity and the excess silicone rubber or flash was trimmed. The lead was cured in the curing oven and then was ready for finishing touches (*See* PSX 9d(1) and 9d(2)). Albert Rambo also remembered leads being made in this manner from mid-1972 to mid-1973.

The testimony of Fletcher, Lettau, and Craig may establish the existence of a single cavity mold (PSX 9a) at Pacesetter in 1972–73, but their testimony raises more questions than answers with respect to how the mold came to be through its various configurations, how the mold was used in production, and what types of leads were produced from the mold. For example, both Fletcher and Lettau identified the single-cavity mold (PSX 9a) as the final configuration of the mold which they, under the direction of Schulman, designed and built in early 1972. But Fletcher and Lettau do not remember the mold evolving from the various configurations in the same way. Fletcher recalls the mold going through only two configurations, the transfer mold and the compression mold. Yet Lettau specifically recalls the mold going through three configurations, the compression mold, the transfer mold, and the reoriented compression mold. The two men most actively associated with the development of this rather important single cavity mold cannot agree on how the mold came to be in its final form. Their disagreement is curious because they both emphasized the clarity of their recollection at trial of the events relating to the development of the mold.

Craig also identified the single-cavity mold (PSX 9a) as the final configuration of the mold which she used to make barbed leads in 1973. But Craig used the mold in a manner different from that which Fletcher and Lettau described as its intended manner of use. Craig told of positioning the commercially available lead body in the mold so that the ring-tip electrode rested in the relief area just at the end of the main cavity of the mold. Both Fletcher and Lettau, on the other hand, said that the ring-tip electrode of the lead was intended to rest in a small specially grooved area of the main cavity of the mold. Craig, Fletcher, and Lettau were each clear in their own way on where the lead body was to be positioned and how the mold was to be used. That Craig's use of the mold differed from that which Fletcher and Lettau, the designers and builders of the mold, intended is interesting because it suggests that the use of the mold and its resulting product are not necessarily limited by the apparent or intended design of the mold. Rather, the user of the mold has some play to fashion a lead in a desired configuration even though the mold design might not readily lend itself to the lead configuration that the user desires.

The testimony of and exhibits related to Fletcher, Lettau, and Craig also raise questions with respect to exactly what types of leads could have been produced from the mold and what types of leads were actually produced from the mold. A source of these questions was a three-cavity wedge tip lead mold of Pacesetter (PX 165). Lettau stated at trial, contrary to his deposition testimony of January 4, 1985, that he was sure he made this three-cavity mold in July and August 1972.[19] Lettau now re-

19. Lettau's testimony at trial was often at odds with testimony from his January 4, 1985 deposition or statements in his August 22, 1983 affidavit. In addition to remembering at trial, but not at his deposition, that he made the three-cavity mold (PX 165), Lettau remembered the various configurations of the single-cavity mold (PSX 9a) differently than at his deposition two months earlier. Lettau also had difficulty reconciling his trial testimony with statements in his affidavit. For example, in his August 22, 1983 affidavit (PX 195), Lettau stated that he made the molds for tined leads, including a two-barbed lead (C) and a eight-barbed lead (D), in the Spring of 1972. But, as Lettau admitted at trial, the two-barbed lead he described and pictured in his affidavit was, in fact, a two-barbed cupped lead made in 1975 and not even in existence in 1972. Similarly, the eight-barbed lead he described in his affidavit could

members that he built the three cavity mold (MX 165) shortly after the single-cavity mold (PSX 9a) in May 1972. Lettau also remembers that the three-cavity mold was used exclusively to make wedge tip leads, not barbed leads. Fletcher and Craig confirmed that the three-cavity mold was used to make wedge tip leads. Comparing the single-cavity mold to the three-cavity mold, the Court finds that the molds are not dissimilar. The molds, in fact, share a number of features common to a transfer mold, including similarly located sprues, gates, and injection holes in the main channel or cavity. The most noticeable difference between the two molds, other than the plugged sprues and gates in the single-cavity mold, is the tip configuration. The tip of the lead in the single-cavity mold was straight shanked and the tip of the lead in the three-cavity mold was wedged. The similarities between the two molds point to the not so unreasonable possibility that the single-cavity mold was once intended and crudely built to produce straight shank leads through the transfer mold process. The three-cavity mold which followed shortly was a more refined attempt at the transfer mold process intended and built to produce wedge tip leads. The Court is not convinced that the single-cavity mold (PSX 9a) was expressly intended, designed, constructed, and used to produce Schulman's two-barbed lead.

In reaching this conclusion, the Court does not ignore Fletcher's testimony that the single-cavity mold was intended to produce two-barbed leads, or Craig's testimony that she observed and personally used the single-cavity mold to produce two-barbed leads. Rather, the Court notes, as Craig's testimony illustrates, that a mold can be used in various ways to arrive at a desired lead configuration. Just as Craig worked within the limitations of the mold to position a ring-tip electrode as she de-

sired, one can work within the limitations of the same mold to produce a barbed lead if desired. The single-cavity mold was not shown to have been exclusively designed and constructed to produce a barbed lead. The single-cavity mold could have been designed and constructed to produce a lead other than a barbed lead. Yet, a barbed lead can be made from the single-cavity mold, just as Craig did (*See* PSX 9d(1) and 9d(2)). Whether the lead from this mold, in fact, has barbs or just excess silicone rubber or flash from the gates which was not trimmed from the lead body is an open question—a question which Pacesetter has not answered clearly to the satisfaction of the Court. In failing to convince the Court that the lead from the single-cavity mold actually had barbs and not untrimmed excess silicone rubber, the possibility remains that the single-cavity mold was first a straight shank lead mold and then, when necessary or convenient, a barbed lead mold. The single-cavity mold (PSX 9a) is, therefore, tangible evidence of questionable significance with respect to Schulman's claim of inventing and using a barbed lead in 1971 and 1972 before the conception of a tined lead as disclosed in the '501 patent.

The Court has carefully considered the testimony and evidence relating to Schulman's claimed prior use and invention in 1971 and 1972 of a barbed endocardial lead. The testimony of Pacesetter's witnesses, especially Schulman, Beazell, Fletcher, and Lettau, is replete with contradictions and inconsistencies, when read both individually and jointly. The frequency and severity of these contradictions and inconsistencies leaves the Court with serious misgivings about the credibility and trustworthiness of Pacesetter's witnesses. The related evidence of prior use and invention, such as the implant records and steel

not have been made in 1972 because the mold was not made until possibly 1975 or 1976. Lettau attempted to smooth these inconsistencies by saying that the tined leads described and pictured in his affidavit were intended only to illustrate the concept of a tined lead. The affidavit, however, does not lend itself to this reading. Lettau's testimony also suggested that the

photograph (E) of the single-cavity mold (PSX 9a) included in his affidavit was attached after he signed the affidavit. Lettau's testimony, when viewed in light of his deposition testimony and affidavit statements, raises questions of credibility with respect to both Lettau and Pacesetter.

molds, did not allay the Court's misgivings. Rather, this related evidence, which was intended to corroborate and bolster the testimony of Pacesetter's witnesses, served to obscure and further confuse the testimony because it lacked contemporaneousness and reliability. Because the contradictions and inconsistencies in the testimony and evidence are so glaring and the credibility and trustworthiness of Pacesetter's witnesses so wanting, the Court seriously questions whether Schulman ever conceived of a barbed endocardial lead before the invention date, let alone the patent application date, of the tined endocardial lead disclosed in the '501 patent. Pacesetter has failed to convince the Court that Schulman even conceived of a barbed endocardial lead prior to the critical date.

Even if the Court were to assume that Schulman did conceive of a barbed endocardial lead prior to the critical date, Pacesetter has failed to convince the Court that such a lead was reduced to practice. Such a barbed lead (be it two-barbed or cloverleaf, depending on the Pacesetter witness) was never shown to have been sufficiently tested to demonstrate that it would work for its intended purpose of passively fixing a pacemaker lead within the human heart.[20] At most, Schulman's barbed lead was shown only to have been in an experimental or testing stage of development and, then, only in dogs. While dogs are an invaluable research medium providing a human-like heart and generating important data, which may well indicate the likelihood of success in human beings, implants of barbed leads in dogs alone cannot suffice for a reduction to practice of a barbed lead. Reduction to practice of a barbed or tined lead must be accomplished through implantation in the human heart. Pacesetter

could not show satisfactorily that Schulman's barbed lead was demonstrated to work in a dog heart and could not possibly show that Schulman's barbed lead was demonstrated to work in a human heart. Pacesetter has failed to convince the Court that Schulman's barbed endocardial lead was reduced to practice.[21]

Even if the Court were to assume that Schulman did conceive of a barbed endocardial lead prior to the critical date and that such a barbed lead was reduced to practice, Pacesetter cannot convince the Court that use of such a lead was a public use. Pacesetter makes much of the fact that its experiments were conducted in an area with unusual and frequent public access, that its employees and consultants were not required to maintain any official secrecy obligations with respect to the barbed lead, and that Schulman freely showed his barbed lead to prospective employees and visitors. But these circumstances do not amount to a meaningful and beneficial disclosure to the public as is inherent in a public use. Pacesetter's use of Schulman's barbed lead was nothing more than experimental and, presumably, subject to alterations and improvements. To the extent the use of Schulman's barbed lead was experimental and within the exclusive control of Pacesetter, the use was not a public use resulting in the disclosure of new and useful information. The Court has considered the circumstances of the use of Schulman's barbed lead, and, taken as a whole, these circumstances do not support a conclusion that the use of Schulman's barbed lead was a public use. Pacesetter cannot convince the Court that any use of Schulman's barbed lead was a public use.

The Court has carefully examined the testimony of the witnesses and the related

---

**20.** The intended purpose of a barbed or tined endocardial lead is to fix passively a pacemaker lead within the ventricles or right atrial appendage of the heart by cooperating with the trabeculae so as to enhance reliable and stable positioning of the lead against the heart wall permitting natural fixation or fibrosis to occur, and to lessen the attendant risks of lead dislodgement and tissue penetration. Because the pacemaker is intended, designed, and marketed primarily, if not exclusively, for the therapeutic implanta-

tion in a human being, the intended purpose of a tined endocardial lead contemplates passive fixation within the human heart.

**21.** Because the Court, assuming that Schulman conceived of a barbed endocardial lead, finds that such a barbed lead was not reduced to practice, the Court need not reach the issue of abandonment, suppression, or concealment under § 102(g), for, technically, no invention existed to be abandoned, suppressed, or concealed.

evidence with respect to prior use and prior invention. Just as the Court was not convinced that the '501 patent was anticipated by publication, especially the Vitatron reference, the Court is not convinced that the '501 patent was anticipated by prior use or prior invention. The Court, in fact, has doubts whether Schulman even conceived of a barbed lead which could have been the subject of use or invention in 1971 and 1972. Even if Schulman did conceive of a barbed lead, however, it was never shown to have been reduced to practice or subjected to a public use. The '501 patent was not shown to have been anticipated by publication, prior use, or prior invention. Pacesetter has failed to persuade the Court by clear and convincing evidence that the '501 patent was anticipated under § 102.

### § 103

 Section 103 provides that:

A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

35 U.S.C. § 103.

The issue under § 103, therefore, is whether the invention as a whole would have been obvious to a person of ordinary skill in the art at the time the invention was made. Several basic factual inquiries must be made under § 103, including the scope and content of the prior art, the differences between the prior art and the claims at issue, and the level of ordinary skill in the pertinent art. *Graham v. John Deere Co.,*

383 U.S. 1, 17, 86 S.Ct. 684, 693, 15 L.Ed.2d 545 (1966). Obviousness or nonobviousness is determined against the background of these factual inquiries. *Id.* Secondary considerations, such as commercial success, long felt but unsolved needs, and failure of others, may also have relevancy as indicia of obviousness or nonobviousness. *Id.* at 17–18, 86 S.Ct. at 693–694. When a patent is challenged on the ground that the claimed invention would have been obvious under § 103, all evidence relevant to the issue of obviousness must be considered. *Stratoflex, Inc. v. Aeroquip Corp.,* 713 F.2d 1530, 1538 (Fed.Cir.1983) (citing *In re Sernaker,* 702 F.2d 989, 996 (Fed.Cir. 1983)).

 The first factual inquiry to be made under § 103 is the scope and content of the prior art. "The scope of the prior art has been defined as that 'reasonably pertinent to the particular problem with which the inventor was involved'." *Id.* at 1535 (quoting *In re Wood,* 599 F.2d 1032, 1036 (C.C.P.A.1979)). Factors to be considered in determining the scope or relevance of the prior art include the type of skill required to understand the disclosure of the patent in suit, as well as the type of art which the PTO applied to the claims. *Orthopedic Equipment Co., Inc. v. United States,* 702 F.2d 1005, 1008 (Fed.Cir.1983).

The particular problem with which Citron was involved in 1972 was the development of an endocardial pacemaker lead with a means of passive fixation to reduce the incidence of lead dislodgement in the ventricles and right atrial appendage and to lessen the risk of tissue penetration or damage in the veins and heart chambers. An indication of the scope of the prior art or the art reasonably pertinent to this problem is the prior art which the PTO cited and applied in the prosecution of the '501 patent. The PTO, in processing the application for the '501 patent, cited and applied a variety of prior art patents [22] and prior

---

**22.** Prior art patents which the PTO cited in connection with the '501 patent include:

U.S. Patent
No. 2,854,983 (Baskin) (Inflatable Catheter) (PX 4)
3,348,548 (Chardack) (Implantable Electrode with Stiffening Stylet) (PX 5)

3,397,699 (Kohl) (Retaining Catheter Having Resiliently Biased Wing Flanges) (PX 6)

3,516,410 (Hakim) (Cerebro-Ventricular Catheter) (PX 7)

3,568,659 (Karnegis) (Disposable Percutaneous Intracardiac Pump (PX 8)

art publications.[23] The scope of these prior art references included both pacemaker leads and catheter-like devices in general. That the PTO cited and applied prior art references involving pacemaker leads and catheter-like devices is not surprising in light of the type of skill required to understand the disclosure of Claim 1 of the '501 patent. A rudimentary knowledge of pacemaker leads and catheter-like devices, as well as a familiarity with the physiology and anatomy of the human heart and vascular system, would be necessary to understand the disclosure of Claim 1 of the '501 patent. The scope of the prior art or the prior art which is reasonably pertinent to the particular problem that Citron faced in 1972 would include pacemaker leads and catheter-like devices.

The content of the prior art includes the references which the PTO cited and applied during the prosecution of the '501 patent and the uncited references which Daig and Pacesetter introduced at trial. With respect to the references which the PTO cited and applied, Daig and Pacesetter rely principally on the Schaldach article (PX 14), the Portsmann article (DX 57), the Rasor-Spickler patent (PX 13), the Avery patent (PX 11), the Collett patent (PX 10), and the Hakim patent (PX 7). With respect to the references which the PTO did not cite, Daig and Pacesetter rely on the Fountain patent (PX 127), the Klieman patent (PX 19), the Vitatron article (PSX 10b), the Rasor-Spickler article (PX 22), the Schaldach German patent (PSX 10d), and the Medtronic flange or wedge tip leads, Models 6901 and 6907 (PX 30 and DX 40).

The Schaldach article, M. Schaldach, *New Pacemaker Electrodes,* 17 American Society for Artificial Internal Organs 29 (1971) (translation) (PX 14), which the PTO cited and applied in the prosecution of the '501 patent, discloses an atrial sensing catheter electrode. This atrial catheter electrode is designed for the stable fixation of the sensing electrode tip in the right atrial appendage, but may also be used in the ventricles. The atrial catheter electrode is made of a silicone rubber insulated helical coil of elgiloy which terminates in a cylindrical elgiloy tip or elgiloy wire hooks turned in a relief loop, not unlike a safety pin (*See* PX 14, Figure 11). The catheter electrode has these fine wire hooks in order to assure stable fixation and to maintain permanent contact with the endocardium of the atrial appendage or ventricles. The fine wire hooks are covered with a guiding catheter or tube until the electrode is properly positioned. The guiding tube is then removed and the fine wire hooks are released and spring into place. The fine wire hooks are intended to anchor firmly between the trabeculae of the atrial appendage or the ventricles.

The Schaldach German patent, German Patent No. 2,053,919 (PSX 10d (with translation) ), which was not before the PTO in the prosecution of the '501 patent, makes virtually the same disclosure as the Schaldach article (PX 14). The Schaldach German patent discloses a cardiac pacemaker electrode, which is made of a coiled wire lead enclosed in an insulating jacket of silicone rubber, terminating in an electrode tip of reverse metal wire hooks (*See* PSX 10d, Figures 1 or 2). This cardiac pace-

| | | |
|---|---|---|
| | and Method of Pumping Blood) | |
| 3,608,555 (Greyson) | (Radioopaque and Optically Transparent Tubing) | (PX 9) |
| 3,717,151 (Collett) | (Flesh Penetrating Apparatus) | (PX 10) |
| 3,719,190 (Avery) | (Heart Stimulation Electrode with a Concical Positioning Parachute) | (PX 11) |
| 3,815,608 (Spinosa et al) | (Retaining Catheter) | (PX 12) |
| 3,835,864 (Rasor et al) | (Intra-Cardiac Stimulator) | (PX 13) |

**23.** Prior art publications which the PTO cited in connection with the '501 patent include:

M. Schaldach, *New Pacemaker Electrodes,* 17 American Society for Artificial Internal Organs 29–35 (1971) (translation) (PX 14);

U. Wende and M. Schaldach, *Neve intrakardicle Schrittmacherelektrode,* 95 Deutsche Medizinische Wochenschrift 2026–2028 (Oct.1970) (PX 15 (with translation) );

H. Pieper, *Registration of Phasic Changes of Blood Flow by Means of a Catheter-Type Flowmeter,* 29 The Review of Scientific Instruments 965–67 (Nov.1958) (PX 16).

maker electrode is designed to improve stable fixation of the electrode against the wall of the atrial appendage or ventricles. The reverse wire hooks, which remain in a catheter until release is appropriate, are intended to ensure fixation by engaging the trabeculae of the appendage or ventricles.

The Portsmann article, W. Portsmann, J. Witte, et al, *P Wave Synchronous Pacing Using Anchored Atrial Electrode Implanted Without Thoracotomy,* 30 The American Journal of Cardiology 74 (July 1972) (DX 57), which was cited in the background of the invention in the '501 patent, discloses the same atrial sensing electrode as the Schaldach article (PX 14) and the Schaldach patent (PSX 10d). That the disclosure is the same is not very surprising since Schaldach was one of the co-authors of the Portsmann article. This sensing electrode, which may be used in both the atrial appendage and ventricles, consists of an elgiloy spiral encased in a silicone rubber insulator terminating in an electrode tip of two fine elgiloy wire hooks or barbs which form a relief loop (*See* DX 57, Figure 1, p. 75; *See also* PX 14, Figure 11, p. 34, and PSX 10d, Figure 2). The two fine wire hooks or barbs of this "fishhook" electrode, which are in the applicator catheter until release, are designed to anchor securely the electrode tip to the trabeculae of the atrial appendage or ventricles.

The Rasor-Spickler patent, United States Patent No. 3,835,864 (PX 13), which the PTO cited and applied in the prosecution of the '501 patent, discloses a wholly self-contained intracardiac stimulator intended for use as a pacemaker. This self-contained pacemaker consists of an elongated capsule-like body covered with a smooth inert material, such as stainless steel, containing a nucleonic or biologically-activated power source. The forward end of this capsule-like body is provided with a pair of oppositely directed, spiral stainless steel wires as means for attaching the pacemaker to the myocardium (*See* PX 13, Figures 1 and 4). These stainless steel tissue-attaching wires or barbs are retained in a retracted position close to the pacemaker body in the sheath until desired positioning of the pacemaker is accomplished, and then the barbs are released springing out to the expanded or operative position. The wires or barbs are literally screwed into the myocardium through clockwise rotation. The pacemaker, with its barbs imbeded in the myocardium, is intended to wedge in the trabeculae. While it is suggested that the device be used in the right ventricle, it may be used in any of the four chambers of the heart.

The Rasor-Spickler self-contained pacemaker may also be modified to function as an endocardial electrode. The modified device acting as an electrode consists of the same capsule-like body, which serves as a means of electrical contact, but without the pulsing circuitry or power source. The electrode itself is connected to the pulse generator by a flexible electrical lead. This electrode device has means of attachment slightly different from that of the self-contained pacemaker. The means of attachment for the electrode device consists of a pair of wires attached to the electrode body and extending rearwardly and outwardly (*See* PX 13, Figure 12). These retaining or attachment wires remain in a sheath until proper positioning is accomplished and the sheath is retracted. The wires then imbed themselves within the heart muscle. The general technique of inserting and implanting this electrode does not differ significantly from that of the self-contained pacemaker.

The Rasor-Spickler article, J. Spickler, N. Rasor, et al, *Totally Self-Contained Intracardiac Pacemaker,* 3 Journal of Electrocardiology 325 (1970) (PX 22), which the PTO did not cite in the prosecution of the '501 patent, discloses the same self-contained intracardiac pacemaker as the Rasor-Spickler patent (PX 13). The Rasor-Spickler article is merely a report on the development and progress of the research on the feasibility of the self-contained intracardiac pacemaker.

The Avery patent, United States Patent No. 3,719,190 (PX 11), which the PTO did cite and consider in the prosecution of the '501 patent, discloses a flexible heart stimulation electrode with a conical para-

chute. This electrode device consists of a flexible wire lead, such as stainless steel or platinum, covered with an insulating material, such as teflon, terminating in an electrode tip or contact made of a physiologically inert metal, such as platinum. Near the electrode tip is a soft, yet resilient, conical parachute made of a physiologically inert and sterilizable material, such as silicone rubber. The apex of this conical parachute is adjacent and directed to the electrode tip. (*See* PX 11, Figure 2). This electrode device is intended to be placed in the heart by insertion through a vein. The device can be easily passed through a cannula into a vein because the parachute is soft enough to be compressed along the lead body. When the device leaves the cannula and enters the vein, the parachute returns to its original conical position. The conical parachute is intended to be caught and swept along in the blood flow drawing the electrode device into the heart. The device may be withdrawn from the heart with a light pull which causes the parachute to invert permitting unimpeded removal. The soft flexible parachute is designed not to damage venal tissue during insertion and removal of the device.

The Collett patent, United States Patent No. 3,717,151 (PX 10), which the PTO cited and applied in the prosecution of the '501 patent, discloses a flesh-penetrating apparatus which provides access to an interior cavity of the body of an animal. This flesh-penetrating apparatus is a medical device which employs a trocar [24] and a cannula [25] to create a drainage outlet from an interior cavity to the body exterior. The cannula, with the trocar inside of and extending or telescoping from it, is inserted through the tissue until the device reaches the body cavity. The trocar is then removed providing an outlet or vent from the body cavity to the exterior. Attached to the end of the cannula by a hinge mechanism are a plurality of radially extendable

plastic fingers. During insertion, the plastic fingers abut or lie against the cannula. Upon insertion into the cavity, the plastic fingers are released or extended radially to form a 90° angle with the longitudinal axis of the cannula. The extended fingers come into contact with the wall of the body cavity and serve to hinder the dislodgement of the cannula in the direction of the body exterior. During removal, the fingers are allowed to pivot about 90° or collapse along the cannula to a position similar to, but in a direction opposite of, that upon insertion (*See* PX 10, Figures 1, 3, and 5). While the device is designed to be used with a trocar to penetrate the tissue for insertion into a body cavity, it may be used without a trocar for insertion through an existing opening, such as the mouth, nose, ear or blood vessel, into a cavity.

The Hakim patent, United States Patent No. 3,516,410 (PX 7), which the PTO cited and applied in the prosecution of the '501 patent, discloses a ventricular catheter for use with ventriculoatrial shunting devices.[26] This ventricular catheter consists of a tube made of a soft, tissue-compatible material, such as silicone rubber, with a plurality of radially extending membranes or discs of the same material attached to the catheter at regular intervals and near the end of the catheter. Between the membranes or discs and in the wall of the tubing are drainage apertures (*See* PX 7, Figures 1 and 2). The ventricular catheter is inserted through brain tissue en route to a ventricular cavity. During insertion, the soft, flexible membranes or discs collapse against the catheter. Upon reaching the ventricular cavity, the membranes or discs return to their normal upright and radial position. The membranes or discs on this ventricular catheter serve to keep the drainage apertures free of material that could plug them and to keep the catheter

---

**24.** A trocar is a sharp pointed surgical instrument or stylet which is used to insert a cannula through tissue into a body cavity.

**25.** A cannula is a tube which is inserted into the body and provides access from the body exterior to a body cavity.

**26.** A ventriculo-atrial shunt or shunting device is a medical device which allows cerebrospinal fluid to drain from the ventricles of the brain into the venous system.

and its apertures from coming into direct contact with the ventricular walls.

The Fountain patent, United States Patent No. 3,492,996 (PX 127), which the PTO did not cite in the prosecution of the '501 patent, also discloses a ventriculo-atrial shunt. This device consists of a thin, flexible catheter, preferably made of silicone rubber, which is positioned in a cranial ventricle. The ventricular end of this shunt device is connected to a pump mechanism, which pumps the cerebrospinal fluid from the cranial ventricle to the vascular system, located under the scalp. Attached to the pump is a telescoping catheter which leads subcutaneously to the atrial end of the shunt. The atrial end of the shunt is positioned within the atrium of the heart through a venal insertion. A plurality of slightly upwardly directed, wing-like projections are located adjacent to the atrial end of the shunt (*See* PX 127, Figure 6). These projections or wings are flexible and bend upward to allow easy passage through the vein to the atrium without damage or scarring to the venal tissue. These projections or wings are intended to retain and center the device within the atrium and center the device in the vein should the device be pulled from the atrium.

The Klieman patent, United States Patent No. 3,635,223 (PX 19), which the PTO did not cite in the prosecution of the '501 patent, discloses an embolectomy catheter. This apparatus consists of an outer guiding cannula and an inner catheter. The outer cannula is made of a nonreactive, nontoxic, and nontraumatic material, such as polyvinylchloride. The inner catheter, which is actually the emboli-extracting instrument, has a soft, flexible distal tip with an inflatable latex, vinyl, or other elastomeric material balloon adjacent the distal tip. The balloon itself has a plurality of rounded

and flexible barbs or protrusions slanting away from the distal tip of the catheter at a 30° to 60° angle. The protrusions on the balloon are sufficiently rounded and flexible to avoid damage to the vascular system, but firm enough to hold onto the clot. (*See* PX 19, Figure 1). The apparatus, with the emboli-extracting catheter inside the outer catheter, is inserted through a vein, such as the femoral vein, and guided through the vena cava and right side of the heart to the pulmonary artery and the site of the embolus or clot. The distal end of the cannula is positioned close to the clot. The inner catheter is then pushed out of the cannula and through and past the clot. The inner catheter is pulled back through the clot and the protrusions on the balloon of the distal tip engage the clot and draw it into the cannula for removal. This operation may be repeated until the entire clot is removed. When the size of the vein or clot requires, the balloon may be inflated to increase its diameter to effect removal of the clot.[27]

The Vitatron article, *Pacemaker Electrode,* 4 Bio-Medical Engineering 383 (August 1969) (PSX 10b), which the PTO did not cite in the prosecution of the '501 patent, discloses an intracardiac pacemaker electrode. This pacemaker electrode consists of a helically coiled elgiloy lead insulated by a tube of silicone rubber and a platinum-iridium electrode tip. The electrode tip is fitted with "a small barbed silicone ring." The ring at the electrode tip is intended to prevent electrode dislocation in the critical postoperative period.

Flange or wedge tip endocardial leads *per se,* especially Medtronic Models 6901 and 6907 (PX 30 and DX 40), were not before the PTO during the prosecution of the '501 patent. A flange or wedge tip

---

**27.** The parties dispute the effect that uncited prior art found in the classes and subclasses which the examiner searched in connection with the '501 patent, such as the Fountain patent and Klieman patent, has in carrying the burden of persuasion with respect to invalidity. As the Court has noted, that burden may be carried more easily when the prior art which was not cited is more pertinent than the prior art which was cited. The Court has carefully examined

the Fountain patent and Klieman patent, and finds that neither patent is more pertinent than the prior art which was cited. At most, the Fountain patent is equally pertinent to the cited art, and the Klieman patent is less pertinent than the cited art. Consequently, the uncited art makes Daig's and Pacesetter's difficult burden of persuasion with respect to invalidity no easier.

lead consists of an electrical conductor encased in an insulating material inert to body fluids, such as silicone rubber, ending in an exposed electrically conductive electrode tip. Adjacent the electrode tip is a small wedge- or flange-shaped projection made of the same insulating material, silicone rubber, as the lead body (*See* PX 30). The flange or wedge tip lead is intended to cooperate with the ventricular apex or the trabeculae of the heart to effect stable fixation. Flange or wedge tip leads, however, could not have been unknown to the PTO because such leads were mentioned specifically in the background section of the '501 patent, as well as in the Smyth article and the Portsmann article referred to in the background section. Additionally, the Schaldach article (PX 14), which the PTO cited and considered, specifically refers, in word and diagram, to flange or wedge tip leads.

■ The second factual inquiry under § 103 is to ascertain the differences between the prior art and the claims at issue. Although findings on the differences between the prior art and the claims at issue are required under *Graham*, the issue under § 103 is not whether the differences themselves would have been obvious. *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1537 (Fed.Cir.1983). Rather, the consideration of differences, like each of the factual inquiries set forth in *Graham*, is but an aid in determining the issue of whether the claimed invention as a whole would have been obvious to a person of ordinary skill in the art at the time the invention was made. *Id.*

The Schaldach references, the Schaldach article (PX 14), the Schaldach German patent (PSX 10d), and the Portsmann article (DX 57),[28] disclose an atrial sensing cathe-

ter electrode. Although this catheter electrode is an endocardial lead which consists of an electrical conductor encased in a material generally inert to body fluids terminating in an exposed electrically conductive electrode tip, it differs significantly from the device disclosed in the '501 patent in that it lacks soft and pliant nonconductive tine means which cooperate with heart tissue to hold the electrode tip in position and prevent penetration of heart tissue. The Schaldach device teaches the use of flexible conductive wire hooks or barbs as a means of lead fixation within the heart and as an integral component of the electrode tip. What the Schaldach device teaches in terms of lead fixation is effectively active fixation. The fine wire hooks are intended to anchor in the trabeculae of the right atrial appendage or ventricles. Although anchoring itself may not readily connote active fixation, it takes on that connotation when seen in the light of the nature of the fine wire hooks of the device and Schaldach's related instructions concerning the use of a guiding catheter during the insertion and retraction of the device to avoid tissue damage or penetration.[29] The Schaldach device does not teach passive fixation through cooperation with heart tissue, as does the '501 patent device. Rather, the Schaldach device teaches active fixation through anchoring in the heart tissue, if not penetration of the heart tissue.

What the Schaldach device teaches in terms of the electrode tip is that the fine wire hooks which anchor the lead are an integral component of the conductive system of the electrode tip. The fine wire hooks are themselves the means by which the electrical impulse is transmitted to the heart tissue. That the fine wire hooks are

---

**28.** The Portsmann article (DX 57) is also a Schaldach reference because it discusses the results of a new technique for the transvenous implantation of an atrial sensing electrode which was the same Schaldach device as disclosed in the Schaldach article (PX 14) and the Schaldach German patent (PSX 10d).

**29.** Schaldach, in fact, referred to this electrode tip with fine wire hooks as a "dangerous tip" which requires the use of a guide catheter "to

avoid injuries by the fine wires" and to accomplish "danger-free positioning and removal." U. Wende and M. Schaldach, *Neue intrakardiale Schrittmacherelektrode*, 95 Deutsche Medizinische Wochenschrift 2026, 2026 (Oct.1970) (PX 15 with translation) ). Schaldach advises in implanting the electrode that "[t]o be avoided in every case is pulling back the unprotected electrode, since otherwise the fine papillary muscles can be injured." *Id.* at 2027.

conductive is essential to the operation of the Schaldach device. The lengthy discussion of metal behavior, surface area, short-circuits, conductivity, and electrochemical reactions in the Schaldach references underscores the importance of wire hooks in the Schaldach device. To the extent the Schaldach device teaches the use of conductive wire hooks, it teaches away from the nonconductive tine means adjacent the electrode tip of the '501 patent device.

The Rasor-Spickler references, the Rasor-Spickler patent (PX 13) and the Rasor-Spickler article (PX 22), disclose an intracardiac stimulator which may be used as either a self-contained pacemaker or an electrode assembly to be connected to a conventional endocardial pacing lead. Both Rasor-Spickler devices teach the use of a pair of stainless steel points or wires located at the forward end of the electrode body as a means of fixation. The self-contained pacemaker has the two stainless steel wires in an oppositely directed spiral configuration. The electrode assembly has the two stainless steel wires extending rearwardly and outwardly from the forward end of the body. Both Rasor-Spickler devices teach active fixation with the stainless steel wires. That the Rasor-Spickler devices teach active fixation can be seen in the language used to describe the steel wires— "tissue- or body-attaching members," "anchor portions," and "attaching points or wires"—and the process by which the steel wires fix the devices in the heart—"attachment," "imbedded," and "forcible retention." The Rasor-Spickler devices, like the Schaldach device, require the use of a protective sheath during insertion to prevent the steel wires from damaging or penetrating venal tissue. The Rasor-Spickler devices do not teach passive fixation through cooperation with heart tissue or the prevention of tissue penetration by means of soft and pliant nonconductive tine means, as does the device of the '501 patent. The Rasor-Spickler devices, instead, teach away from soft and pliant nonconductive tine means with steel wires designed as a means of active fixation to attach to and imbed in, and not cooperate with, heart tissue.

The Avery patent (PX 11) discloses a heart stimulation electrode with a conical parachute. The Avery device, which is an endocardial lead consisting of an electrical conductor encased in a material generally inert to body fluids ending in an exposed electrically conductive electrode tip, is significantly different from the device disclosed in the '501 patent. The Avery device does not teach the use of soft and pliant nonconductive tine means for lead fixation through cooperation with heart tissue or prevention of tissue damage or penetration. The Avery device teaches the use of a soft and pliant conical parachute located near the electrode tip as a means of catching or being drawn into the flow of blood in order to pass the electrode assembly and lead through the vein into the heart chambers. The Avery device teaches only a technique of transvenous implantation of an endocardial lead. The Avery device teaches nothing of the fixation of an endocardial lead, let alone the fixation of an endocardial lead by means of soft and pliant nonconductive tines which cooperate with, yet prevent penetration of, heart tissue.

The Collett patent (PX 10) discloses a flesh-penetrating apparatus. The Collett device differs significantly from the device of the '501 patent. The Collett device is not an endocardial lead, but rather a cannula which serves as a vent from a body cavity to the body exterior. The Collett device does not teach the use of soft and pliant, yet sufficiently rigid, nonconductive tine means at a generally acute angle to the lead or catheter body which are intended to cooperate with, and not penetrate, heart tissue to hold the lead tip in position. The Collett device, however, does teach the use of hard plastic fingers hinged to the body of the cannula as a means of preventing dislodgement of the cannula in the direction of the body exterior. The hinged fingers, which are not unlike a toggle joint, serve not so much as a means of fixing the cannula in the body cavity as a means of retaining the cannula in the body cavity. The hinged fingers, to the extent that they act like a toggle joint, rest against the

tissue of the wall of the body cavity to retain the cannula, but do not cooperate with the tissue to fix the cannula. The hinged fingers are capable of three positions which are accomplished mechanically and not as a result of the material of which the fingers are made. The Collett patent does not teach the passive fixation of an endocardial lead within the heart, as does the device disclosed in the '501 patent.

The Hakim patent (PX 7), which discloses a cerebro-ventricular catheter, also differs significantly from the device of the '501 patent. The Hakim device is not an endocardial lead and does not teach the use of soft, pliant, nonconductive tines as a means of fixation through cooperation with heart tissue. The Hakim device, instead, teaches the use of soft, flexible, radial membranes near the end of the catheter as a means of preventing plugging of the catheter apertures and spacing the catheter from the walls of the ventricles. It is neither designed nor intended to be fixed in position through the cooperation of heart tissue. The Hakim device, unlike the device of the '501 patent, teaches nothing of fixation.

The Fountain patent (PX 127), which discloses a ventriculo-atrial shunt, is quite similar in teaching to the Collett patent (PX 10) and differs from the device of the '501 patent for essentially the same reasons as the Collett patent. The Fountain device is not an endocardial lead, but a ventricular shunt. Although the Fountain device teaches the use of flexible, upwardly directed, wing-like projections near the outlet end of the device, it does not teach the use of these projections as a means of fixation. Rather, the Fountain device, like the Collett device, teaches the use of these projections as a means of retaining the shunt in the atrium in much the same way as a toggle joint. The Fountain device also teaches the use of these projections as a means of spacing the shunt from the atrial wall upon placement and centering the shunt in the vein during insertion. The wing-like projections of the Fountain device are designed to rest against the atrium wall to retain the device in a centered position, but not actually cooperate with the heart tissue. To the extent that the Fountain de-

vice teaches the use of wing-like projections as a means of retaining the device in a centered position in the atrium like a toggle joint, the Fountain device, like the Collett device, teaches away from the use of such flexible projections as a means of passively fixing the electrode tip of an endocardial lead in position through cooperation with heart tissue.

The Klieman patent (PX 19) discloses an embolectomy catheter which also differs significantly from the device of the '501 patent. The Klieman device is simply an inner catheter, which is actually the emboli-extracting instrument, covered by an outer cannula. The Klieman device teaches the use of an inflatable balloon with rounded, flexible barbs near the distal tip of the catheter as a means of engaging and removing emboli in the vascular system. These rounded, flexible barbs are intended not to fix the device in the vascular system, but merely to engage the emboli without damaging the surrounding vascular tissue. The Klieman device, unlike the device of the '501 patent, teaches nothing of fixing the electrode tip of an endocardial lead in position against the wall of the heart through the cooperation of nonconducting tine means with heart tissue.

The Vitatron article (PSX 10b) discloses an intracardiac catheter electrode which is an endocardial electrode with a helically coiled electrical conductor encased in silicone rubber terminating in an exposed electrically conductive electrode tip. The Vitatron device differs from the device of the '501 patent in that the Vitatron device has an electrode tip fitted with "a small barbed silicone ring." The '501 device has an electrode tip fitted with soft, pliant nonconductive tines. As the Court has noted, the term "a small barbed silicone ring" is itself ambiguous and alone teaches nothing. Reading the term "a small barbed silicone ring" in the spirit of the Vitatron article suggests that the Vitatron device has some means of fixation located near the electrode tip. Precisely what kind of fixation means the Vitatron device has, however, cannot be discerned from reading the article alone. The term "a small

barbed silicone ring'' suggests that the electrode tip of the Vitatron device has a ring which is small, which is barbed, which is silicone, and which is different from the structure of the electrode tip of the device of the '501 patent. That "a small barbed silicone ring", as determined from other references, is likely a flange or wedge tip lead corroborates the difference between the device of the Vitatron article and the device of the '501 patent.

The flange or wedge tip leads (PX 30 and DX 40) are endocardial leads with an electrical conductor encased in a material generally inert to body fluids terminating at an exposed electrically conductive electrode tip. The flange or wedge tip leads differ from the endocardial lead of the '501 patent in terms of fixation means. The flange or wedge tip leads teach the use of a small flange- or wedge-shaped projection made of the same insulating and inert material as the lead body located near and pointing away from the electrode tip as a means of lead fixation. The flange or wedge tip leads teach passive fixation through wedging the electrode tip with this projection into position in the heart, most often in the right ventricular apex which has a uniquely accommodating shape for this lead design. The projection on the electrode tip of the flange or wedge tip leads were intended primarily to achieve passive fixation by taking advantage of the complementary muscle structures of the heart, such as the ventricular apex, until fibrosis could occur. The flange or wedge tip leads, of course, often also engaged the trabeculae until fibrosis could occur. The nonconducting tines of the '501 device, on the other hand, were intended primarily to achieve passive fixation by taking advantage of the muscular structures in the heart, such as the trabeculae. The flange or wedge tip leads, unlike the '501 device, do not teach the use of nonconducting tines as a means of passive fixation to hold the electrode tip in position through cooperation with and not penetration of the heart tissue.

 The third factual inquiry to be made is the level of ordinary skill in the art. Factors that may be considered in determining the level of ordinary skill in the art include: (1) the types of problems encountered in the art; (2) the prior art solutions to those problems; (3) the rapidity with which innovations are made; (4) the sophistication of the technology involved; (5) the educational background of those actively working in the field; and (6) the educational background of the inventor. *Orthopedic Equipment Co., Inc. v. United States,* 702 F.2d 1005, 1011 (Fed.Cir.1983) (quoting *Jacobson Brothers, Inc. v. United States,* 512 F.2d 1065, 1071, 206 Ct.Cl. 518 (1975)). Secondary considerations under *Graham,* such as commercial success and failure of others are also invaluable real-life indicia of the level of skill in the art. *Id.* Essential to this inquiry, however, is "adher[ence] to the statute, *i.e.,* to hold that an invention would or would not have been obvious, as a whole, when it was made, to a person of 'ordinary skill in the art'—not to the judge, or to a layman, or to those skilled in remote arts, or to geniuses in the art at hand." *Environmental Designs, Ltd. v. Union Oil Co.,* 713 F.2d 693, 697 (Fed.Cir.1983), *cert. denied,* ⸺ U.S. ⸺, 104 S.Ct. 709, 79 L.Ed.2d 173 (1984).

The Court has considered various factors, especially the educational background of those actively working in the field and the educational background of the inventors, in determining the level of ordinary skill in the art of endocardial pacemaker lead design in 1972. The Court finds that the level of ordinary skill in the art of endocardial pacemaker lead design in 1972 was not particularly high, and certainly not as high as Pacesetter and Daig would have the Court believe. A person of ordinary skill in the art in 1972 would have had a master's degree in electrical or mechanical engineering coupled with a basic knowledge of the physiology and anatomy of the heart and vascular system.

 Secondary considerations, such as commercial success, long felt need, failure of others, copying, and widespread recognition of the significance of the invention in the industry, are relevant indicia of obviousness or nonobviousness, and must be considered when present. *Simmons Fastener Corp. v. Illinois Tool Works,* 739

F.2d 1573, 1575 (Fed.Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 2138, 85 L.Ed.2d 496 (1985); *Stratoflex, Inc. v. Aeroquip Corp.,* 713 F.2d 1530, 1538–39 (Fed. Cir.1983). Objective evidence of nonobviousness, or the *Graham* indicia, "may in a given case be entitled to more weight or less, depending on its nature and its relationship to the merits of the invention. It may be the most pertinent, probative, and revealing evidence available" on the issue of obviousness. *W.L. Gore & Associates, Inc. v. Garlock, Inc.,* 721 F.2d 1540, 1555 (Fed.Cir.1983), *cert. denied,* —— U.S. ——, 105 S.Ct. 172, 83 L.Ed.2d 107 (1984). A nexus between the merits of the claimed invention and the evidence of secondary considerations, however, is required in order for the evidence to be given substantial weight in determining the issue of obviousness. *Simmons Fastener Corp. v. Illinois Tool Works,* 739 F.2d 1573, 1575 (Fed.Cir. 1984); *Stratoflex, Inc. v. Aeroquip Corp.,* 713 F.2d 1530, 1539 (Fed.Cir.1983).

Secondary considerations raised in the evidence at trial included commercial success, contemporaneous or simultaneous invention, long felt need, and failure of others. Commercial success was perhaps the most sharply contested secondary consideration. Medtronic attempted to show that its endocardial tined pacing leads have enjoyed tremendous commercial success which is directly attributable to the invention as expressed in the '501 patent. Medtronic attempted to show the success of the tined leads with reference to its own sales of tined leads,[30] as well as sales of tined leads in the industry as a whole. Medtronic claims that its domestic tined leads sales have grown from two percent of total lead sales in Fiscal Year 1977, when its first tined lead, Model No. 6950/6951, was introduced, to more than 70 percent of total lead sales today (*See* PX 109). Medtronic also claims that the pacemaker leads industry as a whole has focused its attention on and realized greater sales of tined endocardial leads, as a perusal of the advertising of any respectable pacing trade publication will indicate (*See, e.g.,* PX 40). Every manufacturer and supplier of pacemaker leads, according to Medtronic, now sells tined leads. As an example, Medtronic cites the pacemaker lead sales records of Pacesetter. Pacesetter's sales of tined leads, according to Medtronic, have grown from no sales in 1978 to 98 percent of total domestic lead sales and 97 percent of total domestic and international lead sales in 1984 (*See* PX 181). As another example of how the pacemaker leads industry has accepted the tined endocardial lead, Medtronic offered the licensing agreements of the '501 patent and the schedule of royalties received from Cardiac Pacemakers, Inc. (CPI) and Cordis Corporation (Cordis) (*See* DX 38, DX 39, and PX 154).[31] Medtronic believes that the

---

**30.** In assessing commercial success, Medtronic did not distinguish between sales of individual models of tined leads and tined leads as a whole. For Medtronic, all of its tined leads, Model Nos. 6950/6951, 6961/6962, 6971/6972, 6990, 6991, 6991U, 6993, 4002, 4502, 4012, and 4512, include soft, pliant, nonconductive tine means for cooperating with heart tissue to hold the lead tip in position in conformance with the '501 patent. Although specific tine length and location may vary with lead model, Medtronic contends that these leads are the equivalent of the tined endocardial lead disclosed and described in the '501 patent, and, therefore, the sales of these tined leads are relevant to the commercial success of the tined endocardial lead.

**31.** On October 19, 1984, Cordis brought suit against Medtronic in the United States District Court for the Southern District of Florida. Cordis sought declaratory judgment of the invalidity of United States Patent Nos. 3,902,501 and

3,939,843, and the invalidity of the license agreement between Cordis and Medtronic involving those patents. Cordis also sought a preliminary injunction enjoining Medtronic from terminating its license agreement with Cordis during the pendency of this action, and the establishment of an interest bearing escrow account for the receipt of royalty payments due under the license agreement during the pendency of this action. Medtronic moved to dismiss Cordis' declaratory judgment complaint, or, in the alternative, to transfer the action to the United States District Court for the District of Minnesota. On January 10, 1985, Cordis' Motion For Establishment of Escrow Fund and for Preliminary Injunction, and Medtronic's Motion to Transfer were granted.

The action, *Cordis Corporation v. Medtronic, Inc.,* Civil No. 4–85–138, is now before the United States District Court for the District of Minnesota. Daig moved on January 28, 1985 to consolidate the issues of the '501 patent validity

tined endocardial lead, as disclosed in the '501 patent, has enjoyed commercial success.

In a further attempt to show commercial success, Medtronic claimed that its tined endocardial leads overcame great skepticism in the medical community to become the lead of choice. Medtronic offered the testimony of Dr. James Maloney to illustrate this point. Dr. Maloney is a cardiologist specializing in clinical electrophysiology and clinical pacing at the Cleveland Clinic in Cleveland, Ohio, where he is the director of the electrophysiology laboratory. He has been with the Cleveland Clinic since 1981, and before then he was with the Mayo Clinic in Rochester, Minnesota. Dr. Maloney actually instituted the clinical electrophysiology program and practice at the Mayo Clinic. Dr. Maloney stated that the tined endocardial lead was received initially with reservation and uncertainty at the Mayo Clinic. Dr. Maloney and his colleagues at the Mayo Clinic, in fact, were offered the opportunity in 1975–76 to do clinical testing on the first Medtronic tined lead, Model No. 6950/6951, but declined the opportunity. Dr. Maloney and his colleagues did not consider the tined lead to be a viable alternative in endocardial pacing at that time. Physicians at the Cleveland Clinic and other larger pacing centers on the East Coast of the United States, according to Dr. Maloney, had even greater reservations and uncertainties about the tined endocardial lead. Not until the clinical testing and implant data demonstrated the efficacy of the tined lead did Dr. Maloney, his colleagues, and other physicians accept the tined lead. Dr. Maloney now believes the tined lead to be the most popular endocardial lead and lead of choice in the medical community today. Dr. Maloney's own experience at the Cleveland Clinic today shows that 99.5 percent of endocardial leads used in the ventricles are tined leads, and 70 percent of endocardial leads used in the atrium are tined leads with the remaining 30 percent being screw-in leads. Dr. Maloney is so convinced of the efficacy of the tined endocardial lead

that he believes a physician who implants a flange or wedge tip lead today, when the physician has a choice between a wedge tip lead and a tined lead, is acting unethically. To implant a lead with a simple wedge and no tines, according to Dr. Maloney, is not proper medical practice in the light of the available information. Medtronic believes that the endorsement of the tined lead as the lead of choice in the medical community today is evidence of the commercial success of the tined endocardial lead as disclosed in the '501 patent.

Daig and Pacesetter attempted to counter Medtronic's claim of tremendous commercial success of its tined endocardial leads. Daig and Pacesetter sought to establish that no nexus existed between the claimed commercial success of Medtronic and the presence of soft, pliant, nonconductive tines on these endocardial leads. Daig and Pacesetter initially point to the first commercial tined ventricular lead of Medtronic, Model Nos. 6950/6951. For Daig and Pacesetter, Model Nos. 6950/6951 provide the most significant indication of the commercial success of a Medtronic tined endocardial lead because they were essentially the same leads as the existing wedge tip leads, except for the tines. Model Nos. 6950/6951 are also perhaps the most significant indication of the commercial success for Daig and Pacesetter because Model Nos. 6950/6951 themselves were not successful. As Dr. Maloney's testimony indicated, physicians in 1976 were skeptical and questioned the viability of a tined endocardial lead due in part to the size, shape, and location of the tines which were rather long. Medtronic did not begin to realize any commercial success on its tined leads until it redesigned Model Nos. 6950/6951 to form Model Nos. 6961/6962 with short, stubby tines closer to the lead tip. According to Daig and Pacesetter, that Model Nos. 6950/6951, which were the only Medtronic leads to provide a "pure" comparison between new tined leads and existing wedge tip leads, were commercially unsuc-

and infringement in the Cordis litigation with the Medtronic/Daig/Pacesetter litigation, but

the Court refused to consolidate the actions so close to the eve of trial.

cessful prevents Medtronic from demonstrating the required nexus between the commercial success of other later tined leads with additional features and tines on these leads. Commercial success of any Medtronic tined lead, Daig and Pacesetter conclude, cannot be demonstrated.

Daig and Pacesetter also attempted to limit the significance of the greater acceptance and sales of later Medtronic tined endocardial leads. Daig and Pacesetter sought to attribute any success of later tined leads to features of the leads other than tines. For example, Daig and Pacesetter sought to attribute the success of Model Nos. 6961/6962, which followed Model Nos. 6950/6951, to a variety of features other than tines, including a Multi-Filar conductor coil and a ring tip electrode. Daig and Pacesetter also suggested that the success of later tined leads was attributable to the improved implantation technique of surgeons. No one feature of these later tined endocardial leads, especially tines, could be determined to be the primary reason for the commercial success of these later Medtronic tined leads, according to Daig and Pacesetter. Because no nexus could be established between the acceptance and sales of these later tined leads and the existence of tines themselves, Daig and Pacesetter conclude that Medtronic cannot show commercial success of its tined lead.

As a final attempt to counter any claim of commercial success of Medtronic tined leads, Pacesetter offered the testimony of Dr. Irving Plotkin. Dr. Plotkin is a Vice President of Arthur D. Little, Inc., and a Director of its valuation subsidiary. He is a microeconomist who specializes in the analyses of the effects of various types of government regulation, self-regulation, and taxation on capital flows, output, prices, risk-taking, competition, and efficiency within individual industries. Dr. Plotkin, who has been with Arthur D. Little, Inc. since 1968, has designed, directed, and conducted research for a variety of prominent clients in both the public and private sectors. Dr. Plotkin stated that, based on the data which Pacesetter presented to him, Medtronic could not demonstrate that tines in themselves accounted for the sales of Medtronic tined leads. Additionally, Dr. Plotkin stated that Medtronic could not demonstrate commercial success with respect to any tined endocardial lead which he considered to be a product innovation. Dr. Plotkin defined commercial success of a product innovation to be an aggressive growth in market share. Dr. Plotkin found that Medtronic could not show its tined leads to be commercially successful because Medtronic failed to realize an aggressive growth in market share, but rather realized a decrease in market share, and because Medtronic's sales of tined leads tended to cannibalize its existing endocardial lead market. In arriving at this conclusion, Dr. Plotkin found significant the market results of Medtronic Model Nos. 6950/6951 because they were the only leads which allowed him to assess the effect of tines alone on lead sales. All later Medtronic leads, such as Model Nos. 6961/6962, combined other features or improvements with tines which, in his opinion, presented multiple and indistinguishable causes of acceptance and sales of Medtronic tined leads. Consequently, Daig and Pacesetter argue, the Medtronic tined leads cannot be shown to be a commercial success.

The Court has considered the evidence with respect to commercial success, and although the Court is not prepared to accept Medtronic's conclusion that its tined leads enjoyed tremendous commercial success, the Court is similarly not prepared to accept Daig's and Pacesetter's conclusion that the Medtronic tined leads enjoyed absolutely no commercial success. The Court, however, is satisfied that the Medtronic tined leads have enjoyed sufficient commercial success to suggest the nonobviousness of the tined endocardial lead disclosed in the '501 patent. In so concluding, the Court is not unaware of Daig's and Pacesetter's concern that Medtronic tined leads should not be viewed as generic devices with tines, but rather individual devices with varied features and improvements other than tines. The Court is also not unaware of the possible influence that

some of these varied features and improvements, such as a Multi-Filar coil and a ring tip electrode, may have had on tined lead sales. But the Court is satisfied that the primary reason Medtronic tined leads sold was the presence of soft, pliant, nonconductive tines. The Court notes that Dr. Maloney, an amply qualified and credible expert in pacing, testified that the presence of tines on an endocardial electrode is the major factor in deciding whether to select a lead. Dr. Maloney stated that if he were offered a lead with improvements such as a Multi-Filar coil and a ring tip electrode but no tines, he would reject it outright because of the absence of tines as a means of passive fixation.[32] Tines, for Dr. Maloney, are a necessary, if not indispensable, component of an endocardial lead designed to remedy the most significant and difficult problem of endocardial pacing, acute lead dislodgement. The Court is satisfied that the commercial success of the Medtronic tined leads is causally linked to the presence of tines on these leads and the advantages inherent in such tines as disclosed in the '501 patent.

In reaching the conclusion that the Medtronic tined lead has enjoyed some commercial success, the Court is not unmindful of Dr. Plotkin's conclusion to the contrary. Dr. Plotkin was an amply qualified and credible expert microeconomist, and his conclusion with respect to the commercial success of the tined lead was rooted deeply in economic theory and the capital market standard. His reliance on economic theory, however, perhaps so skewed his reasoning as to limit its applicability in terms of commercial success for purposes of this patent action. Dr. Plotkin defined commercial success for the tined lead, which he considered a product innovation, to be an aggressive growth in market share. He could find no commercial success for Medtronic tined leads because the tined leads showed no aggressive growth in market share, and, in fact, the tined leads appeared to cannibalize Medtronic's existing endocardial lead market.[33] Dr. Plotkin's definition and analysis of commercial success focused clearly, if not exclusively, on the economic effect of the product innovation, the tined lead, on the product innovator, Medtronic. Dr. Plotkin's definition and analysis of commercial success did not look to the effect, of any kind, of the product innovation on the industry as a whole. Such a definition and analysis could lead to the conclusion that a product innovation *per se* was not a commercial success, but the same product innovation nonetheless had a profound influence on the industry and market. That conclusion may well be what Dr. Plotkin offered the Court. In a pure economic analysis, using, as Dr. Plotkin described it, the "tough" capital market standard, the Medtronic tined lead was probably not commercially successful. In a rather pragmatic analysis, however, looking to a pacing industry which now intensively markets tined leads, and to a medical community which now regards tined leads as leads of choice, the Medtronic tined lead was commercially successful. The Court is satisfied that Medtronic has shown that its tined leads, which embody the advantages inherent in the endocardial lead disclosed in

---

32. Dr. Maloney gave an example of such a rejection of a non-tined lead during his tenure at the Mayo Clinic. In 1978, Dr. Maloney and his colleagues at the Mayo Clinic were presented with a new porous tip, Multi-Filar coil lead without tines. They attempted to use the lead in clinical study but encountered major problems with dislodgement. They subsequently abandoned the clinical study of that lead until the manufacturer provided tines on that lead.

33. Even accepting Dr. Plotkin's pure economic definition and analysis of commercial success, the Court wonders whether cannibalizing the existing market, in this instance, actually goes to show lack of commercial success. Dr. Plot-

kin believed that the Medtronic tined lead lacked commercial success because it tended to cannibalize the existing market for Medtronic straight shank and wedge tip leads. But would not a product innovator, such as Medtronic, desire that its innovation, the tined lead, cannibalize the existing market when the innovation is intended or designed to render obsolete those products which currently occupy the market? If not from an economic standpoint, at least from a medical standpoint, one would hope that a product innovation which so enhances the existing product as to render the existing product obsolete would cannibalize the existing market.

the '501 patent, have enjoyed sufficient commercial success to suggest nonobviousness.

Daig and Pacesetter also offered evidence of contemporaneous invention as a secondary consideration which suggests obviousness. Daig and Pacesetter attempted to show that Schulman at Pacesetter, Hess at Cordis, and Rasor and Spickler at the Cox Heart Institute had independently invented a tined endocardial lead at approximately the same time as Citron and Dickhudt. The Court finds the evidence completely lacking to support these claims of contemporaneous invention. Daig and Pacesetter have failed to demonstrate to the satisfaction of the Court that Schulman, Hess, and Rasor and Spickler even conceived of an endocardial lead with soft, pliant, nonconductive tines, let alone reduced such a lead to practice. Daig and Pacesetter were unable to support their claims of contemporaneous invention with reliable and contemporaneous documents, records, or other physical evidence. The evidence which Daig and Pacesetter offered to show contemporaneous invention and obviousness actually tends more to show the lack of contemporaneous invention and nonobviousness.

Particularly revealing, with respect to the failure of Daig and Pacesetter to demonstrate contemporaneous invention, is the failure of the claimed contemporaneous inventors to have realized and acknowledged their inventions. Schulman, who claimed to have invented a tined lead in 1971 at Pacesetter, dismissed the significance of such a lead. Apparently, Schulman's tined lead failed to gain significance as the years passed because Pacesetter began purchasing all its tined leads from Daig in 1978, and Schulman said not a word. One would think that Schulman would have at least mentioned to Pacesetter that he had invented some seven years earlier the tined lead which Pacesetter intended to purchase from Daig. Similarly, Hess, who claimed

in his deposition to have invented a tined lead in 1973 at Cordis, failed to make any bench tests or clinical tests, animal or human, of the tined lead. Instead, Hess placed the samples of the tined lead in a box to be forgotten on a shelf at Cordis. Apparently, Hess' tined lead was forgotten because Cordis entered into a licensing agreement with Medtronic to manufacture the tined endocardial lead in 1982. Again, one would think that Hess would have mentioned to Cordis that he had invented some nine years earlier the tined lead which was the subject of the license agreement between Medtronic and Cordis.[34] Rasor and Spickler, who claimed to have invented a tined lead in 1969 at the Cox Heart Institute, did not envision a tined lead equivalent to that disclosed in the '501 patent. Rasor and Spickler, in fact, rejected radiating metal fingers, which were as close to soft, pliant, nonconductive tine means as Rasor and Spickler came, as a means of fixation for endocardial leads from 1970 through 1976. Daig and Pacesetter failed to demonstrate satisfactorily any semblance of contemporaneous invention so as to suggest the obviousness of the tined endocardial lead disclosed in the '501 patent.

Medtronic also offered evidence of long felt need as a secondary consideration which suggests nonobviousness. Medtronic attempted to show that its tined endocardial leads satisfied a long felt need in the medical community. Acute lead dislodgement, according to Dr. Maloney, was the most significant problem encountered in the implantation of endocardial pacing leads in the early 1970s. The existing endocardial leads, primarily the straight shank lead and wedge tip lead, would all too frequently slip or dislodge before fibrosis could occur to fix naturally the leads within the heart. The existing endocardial leads, especially the wedge tip, also tended to penetrate or work through the heart

---

**34.** Of course, both Pacesetter and Cordis, had they known that their employees had invented a tined lead, may still have chosen to go outside the company for the right to produce or for production of the tined lead for economic rea-

sons. The point remains, however, that neither Pacesetter nor Cordis was given the option or made aware that their employees had already made such leads.

tissue upon implantation. Because of the problems of acute lead dislodgement and heart penetration inherent in the existing endocardial leads, a felt need existed to remedy these problems. The Medtronic tined leads, which embodied the advantages inherent in the device disclosed in the '501 patent, satisfied this felt need, according to Dr. Maloney. The Court finds that a felt need existed in the early 1970's for an endocardial lead with reduced lead dislodgement and heart penetration characteristics. The Court further finds that the Medtronic tined leads satisfied this need. Although the Medtronic tined leads may not have had as a spectacular or profound impact in the medical community as Medtronic would have the Court believe, the Court is convinced nonetheless that the Medtronic tined leads satisfied a felt need sufficient to suggest nonobviousness.

Medtronic also offered evidence of failure of others as a secondary consideration which suggests nonobviousness. Medtronic attempted to show, with special reference to the work and prior art of Schaldach and Rasor and Spickler, that others had failed in the early 1970's to develop an endocardial lead with a passive means of fixation which was less prone to dislodgement and penetration. As the work and prior art of Schaldach and Rasor and Spickler reflects, they tried a variety of fixation or attachment techniques in an effort to enhance the utility of the endocardial lead. None of them, however, recognized the advantages of soft, pliant, nonconductive tines as a means of passive fixation which was less likely to dislodge or penetrate heart tissue. The work of Schaldach and Rasor and Spickler, which typifies some of the work of the early 1970's, indicates that while the advantages of fixation in the trabeculae were recognized or desired, active fixation continued to be guiding influence in the design of fixation means for endocardial leads. Even discounting the active fixation nature of the Schaldach and Rasor and Spickler work, their work still posed the real threat of penetration. To the extent that the work of Schaldach and Rasor and Spickler does not reflect a recognition of the inherent advantages of soft,

pliant, nonconductive tines as a means of fixation, it tends to show that they failed to develop a means of passive fixation which would reduce acute lead dislodgement and heart penetration. This failure tends to suggest the nonobviousness of the tined endocardial lead which is disclosed in the '501 patent.

The question of obviousness, as the Court of Appeals for the Federal Circuit has acknowledged, is simple to ask, but difficult to answer. *Orthopedic Equipment Co., Inc. v. United States*, 702 F.2d 1005, 1012 (Fed.Cir.1983). The difficulty in answering this question is due in no small part to the strong temptation to resort to and rely on hindsight in formulating the answer. Hindsight, however, is quite improper when resolving the question of obviousness. To use the patent in suit as a guide through the morass of prior art references, combining the right references in the right way to arrive at the result of the claims in suit, is, therefore, also quite improper. *Id.* Combining the teachings of the prior art to produce the claimed invention, absent some teaching, suggestion or incentive supporting the combination, cannot establish obviousness. *ACS Hospital Systems, Inc. v. Montefiore Hospital*, 732 F.2d 1572, 1577 (Fed.Cir.1984). The test remains whether the claimed invention as a whole would have been obvious to a person having ordinary skill in the pertinent art at the time the invention was made. 35 U.S.C. § 103. The test, as applied in this action, is whether a tined endocardial lead, as claimed in the '501 patent, would have been obvious to a person having ordinary skill in the art of endocardial pacing lead design in July 1972.

The Court has attempted diligently to make the basic factual inquiries under § 103, as *Graham* requires, and to examine the results of those inquiries. The Court has also examined the evidence of secondary considerations. Upon full consideration of all the evidence, the Court finds that the invention claimed in the '501 patent would not have been obvious to a person having ordinary skill in the art at

the time the invention was made. None of the prior art references, either alone or in combination, would have taught, disclosed, or suggested to a person of ordinary skill in the art the use of soft, pliant, nonconductive tines as a means of passive fixation for cooperating with heart tissue to hold the lead tip in position without penetrating the heart tissue. The evidence of secondary considerations also suggests that the invention claimed in the '501 patent was not obvious. To find otherwise would reveal the Court succumbing to the temptation of hindsight for it is hindsight which entices and deceives in this analysis. Without resort to hindsight, Daig and Pacesetter cannot show the claimed invention of the '501 patent to be obvious. Daig and Pacesetter have failed to persuade the Court by clear and convincing evidence that the invention claimed in the '501 patent would have been obvious to a person having ordinary skill in the art at the time the invention was made.

### § 112

■ Section 112 provides in relevant part that:

The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

\* \* \* \* \* \*

35 U.S.C. § 112.

The relevant portion of § 112 requires that the inventor provide an enabling description of the invention, the best mode which the inventor contemplates for the invention, and a distinct claim or claims of the subject matter which the inventor regards as the invention. To satisfy the enabling requirement of § 112, a patent must contain a description that enables a person

skilled in the art to make and use the claimed invention. *Atlas Powder Co. v. E.I. Du Pont de Nemours,* 750 F.2d 1569, 1576 (Fed.Cir.1984) (citing *Raytheon Co. v. Roper Corp.,* 724 F.2d 951, 960 (Fed.Cir. 1983)). That some experimentation is necessary to make and use the invention does not preclude enablement. *Id.* (citing *W.L. Gore & Associates, Inc. v. Garlock, Inc.,* 721 F.2d 1540, 1557 (Fed.Cir.1983), and *In re Angstadt,* 537 F.2d 498, 503 (C.C.P.A. 1976)). The amount of experimentation needed, however, must not be unduly extensive. *Id.*

The question with respect to enablement is whether the disclosure in the specification of the '501 patent is sufficient to enable a person skilled in the art to practice the claimed invention. Pacesetter attempted to show that the specification of the '501 patent was not enabling in at least two ways. First, the '501 patent specification was not enabling because it failed to provide adequate information from which to design a workable lead. That detailed information was not provided in the specification with respect to lead body diameter, tine diameter, tine length, tine location, and tine flexibility, according to Pacesetter, precludes enablement. Pacesetter believes this information to be critical and without such information the '501 patent specification cannot enable. The Court, however, finds that a person skilled in the art of endocardial lead design would find the disclosure in the '501 patent specification sufficient with which to make and use a tined endocardial lead. Although the information which Pacesetter seeks is important, it is not necessarily critical. A person skilled in the art, who would presumably have a basic knowledge of the physiology and anatomy of the heart and vascular system, would be able to deduce this information from the available knowledge of the structure of the heart and endocardial leads.

■ The second way in which Pacesetter attempted to show that the '501 patent specification was not enabling was that it would take an unreasonable amount of experimentation to get from the patent

specification to a working tined lead. Although some experimentation would certainly be necessary to go from the specification to a working tined lead, that experimentation would not be unduly extensive or unreasonable for a person skilled in the art. If, however, a person would want to go from the specification to a commercially acceptable and marketable tined lead, then extensive experimentation would be needed. But the specification need not, and often cannot, disclose a finished commercial product or embodiment. Experimentation related to producing a commercially acceptable product, therefore, cannot defeat an enabling specification. A person skilled in the art would be able to go from the specification to a working tined lead without undue experimentation. The Court finds that the specification of the '501 patent would enable a person skilled in the art of endocardial pacing lead design to make and use the claimed invention of a tined endocardial lead.

To satisfy the best mode requirement of § 112, the inventor must set forth the best mode of practicing the invention known to the inventor at the time the patent application was filed. *W.L. Gore & Associates, Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1556 (Fed.Cir.1983). Even if a better mode of carrying out the invention exists and the inventor fails to disclose it, the best mode requirement may still be satisfied if the inventor does not know of or appreciate the better mode. *Id.* For a disclosure to fail to set forth the best mode, it must be shown that the quality of the disclosure is so poor as to result effectively in concealment. *Matter of Application of Sherwood*, 613 F.2d 809, 816 (C.C.P.A.1980). The best mode disclosed need not necessarily be the optimum mode of carrying out the invention. *Plastic Container Corp. v. Continental Plastics*, 607 F.2d 885, 897 (10th Cir.1979).

The question with respect to best mode is whether the inventors adequately disclosed the contemplated best mode in the specification of the '501 patent. Both Daig and Pacesetter attempted to show that Citron and Dickhudt failed to disclose the best mode of practicing the invention which they knew at the time the patent application was filed. Daig and Pacesetter point to Citron's laboratory notebook (PX 42). Although the laboratory notebook contains the sketch of the tined lead which was disclosed in the '501 patent (*See* PX 42, p. 50), it also contains a photograph of a prototype tined lead which was not disclosed in the '501 patent (*See* PX 42, p. 51). This photograph, according to Daig and Pacesetter, represents the best mode which Citron and Dickhudt contemplated at the time of the '501 patent application. Daig and Pacesetter also point to the correspondence between Dr. Smyth and Citron from March to May 1973 which involved various improvements in the design of the tined lead (*See,* e.g., PSX 22b and 22c). These improvements, which included increasing tip exposure, repositioning the vertex of the tines, and moving the tines closer to the lead tip, were incorporated into Citron's tined lead, but were not disclosed in the '501 patent application in July 1973. The tined lead with these improvements, according to Daig and Pacesetter, was the best mode contemplated at the time of the '501 patent application. Daig and Pacesetter believe that, because the '501 patent discloses neither the photograph of the prototype tined lead from Citron's notebook, nor the improvements discussed in the correspondence between Dr. Smyth and Citron, the '501 patent fails to disclose the best mode of practicing the invention.

The Court, however, finds that the '501 patent does disclose the best mode which Citron and Dickhudt contemplated at the time of the '501 patent application. It is true that both the prototype photograph and the discussed improvements were not expressly disclosed in the '501 patent. Yet it is also true that both Citron and Dickhudt were not aware that the prototype photograph and discussed improvements represented the best mode of their invention at the time of the patent application. Rather, the most that could be said, at the time of the '501 patent application, was that a variety of experiments and tests were being conducted with respect to the prototype tined lead in the photograph and

the improvements discussed between Dr. Smyth and Citron. The prototype photograph and the discussed improvements may seem today to represent a much better mode than that disclosed in the '501 patent. But that conclusion, in which both Daig and Pacesetter join, is the result of hindsight as focused by the evolution of the tined endocardial lead which has occurred in the 12 years since the '501 patent application. What seems today to have been a better mode then matters not. What matters is the best mode which Citron and Dickhudt contemplated for their invention when they applied for a patent. That Citron and Dickhudt contemplated the prototype tined lead in the photograph and related improvements to be the best mode of their invention at the time of their patent application was not shown. The Court concludes that the specification of the 501 patent sets forth the best mode, which Citron and Dickhudt contemplated at the time of the '501 patent application, of carrying out their invention.

 To satisfy the definiteness or distinctly claiming requirement of § 112, the claims must make clear the subject matter which they embrace and so make clear the subject matter from which they preclude others. *Application of Conley,* 490 F.2d 972, 975 (C.C.P.A.1974). It is a requirement of precision and definiteness intended to point out what the invention is in contradistinction to the prior art and to define the scope of protection of the patent. *In re Vamco Machine and Tool, Inc.,* 752 F.2d 1564, 1577 n. 5 (Fed.Cir.1985). If the scope of the subject matter which the claim embraces is clear, and if the inventor has not indicated that a claim of a different scope is intended, then the claim does particularly point out and distinctly claim the subject matter which the inventor regards as the invention. *Application of Conley,* 490 F.2d 972, 975 (C.C.P.A.1974).

The question with respect to definiteness is whether the claim language is sufficiently precise and definite so that one can readily determine if one would infringe the claim. The Court finds that the language of Claim 1 of the '501 patent is sufficiently precise and definite. Although Claim 1 of

the '501 patent, like any patent, contains some words of degree and function, such as adjacent and means, the claim language does not lack definiteness. A person of ordinary skill in the art would understand the claim language when the claim is read in light of the specification. Because a person of ordinary skill in the art would understand what is claimed in Claim 1 of the '501 patent, the Court finds that Claim 1 particularly points out and distinctly claims the subject matter which Citron and Dickhudt regarded as their invention.

The Court has carefully considered the evidence with respect to the requirements of § 112, especially, enablement, best mode, and definiteness. The Court finds that the specification of the '501 patent would enable a person skilled in the art to make and use the invention, that the specification of the '501 patent does set forth the best mode which the inventors contemplated of carrying out their invention, and that Claim 1 does particularly point out and distinctly claim the subject matter which the inventors regard as their invention. Daig and Pacesetter have failed to convince the Court by clear and convincing evidence that the '501 patent does not satisfy the enablement, best mode, and definiteness requirements of § 112.

The question remaining for the Court is whether all the evidence establishes that the challengers of the validity of the '501 patent, Daig and Pacesetter, have carried the burden which § 282 imposes on them so as to have persuaded the Court that the '501 patent can no longer be accepted as valid. The Court finds that Daig and Pacesetter have failed to carry this burden of persuading the Court of invalidity by clear and convincing evidence. The Court, therefore, continues to accept the '501 patent as valid.

## INFRINGEMENT OF THE '501 PATENT

### *Burden of Proof*

 The patent owner has the burden of showing by a preponderance of the evidence that the accused device infringes the patent. *Hughes Aircraft Co. v. United States,* 717 F.2d 1351, 1361 (Fed.Cir.1983).

Whether an accused device infringes a valid patent requires resort in the first instance to the words of the claim which define the metes and bounds of the patent right. *Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 607, 70 S.Ct. 854, 855, 94 L.Ed. 1097 (1950).[35] If the accused device falls clearly within the claim, literal infringement is made out. *Id.* If, however, the accused device does not fall clearly within the claim and literal infringement is not made out, then the doctrine of equivalents comes into play. Under the doctrine of equivalents, an accused device which does not literally infringe a claim may still be found to infringe "if it performs substantially the same function in substantially the same way to obtain the same result." *Id.* at 608, 70 S.Ct. at 856. Whether an accused device is an equivalent is determined with reference to the patent, the prior art, and the particular circumstances of the case. *Id.* at 609, 70 S.Ct. at 856.[36]

Claim 1 of the '501 patent, as the Court has discussed, contemplates an improvement to an endocardial lead which comprises:

> nonconducting tine means extending from said encasing material and away from said tip from a location adjacent said tip for cooperating with heart tissue, to hold the tip in position, said tine means forming a generally acute angle with said encasing material and being entirely of a pliant material having sufficient rigidity to maintain said angle when said tine means are unrestrained, but sufficiently pliant to prevent penetration of

said heart tissue, said pliant material being generally inert to body fluids.

(PX 1, column 6, lines 56–66).

The language of the claim is fairly straightforward and lends itself to an ordinary and commonsense meaning. Claim 1 speaks of nonconducting tine means which are barbs or projections. The tine means are located adjacent or near the electrode tip. The tine means extend from the lead body and away from the electrode tip forming an acute angle with the lead body. The tine means are intended to cooperate with heart tissue, such as the trabeculae, to hold the electrode tip in position against the heart wall. The tine means are made of a material inert to body fluids, such as silicone rubber or polyurethane, which is sufficiently rigid to maintain the acute angle of the tine means in relation to the lead body when unrestrained, yet sufficiently pliant to prevent penetration or perforation of heart tissue.

### 3. *Daig Tined Endocardial Leads*

Medtronic offered four Daig tined endocardial leads as accused devices falling clearly within Claim 1 of the '501 patent. These accused devices include the Daig ventricular silicone tined lead (PX 56), the Daig atrial J silicone tined lead (PX 58), the Daig urethane tined wedge lead (PX 60), and the Daig urethane atrial J tined lead (PX 62). The Daig ventricular silicone tined lead (PX 56) is an endocardial lead which has a plurality (4) of nonconducting barbs or projections or tine means located near the electrode tip. The tine means

---

**35.** The patented invention as reflected in the language of the claims must first be defined. *Envirotech Corp. v. Al George, Inc.*, 730 F.2d 753, 758 (Fed.Cir.1984). "Words in a claim 'will be given their ordinary and accustomed meaning, unless it appears that the inventor used them differently'." *Id.* at 759 (quoting *Universal Oil Products Co. v. Globe Oil & Refining Co.*, 137 F.2d 3, 6 (7th Cir.1943) ). The specification and drawings of a patent may also be used in interpreting the claims, but the claims are not limited in scope to any particular mode for practicing the invention that is described in the specification or drawings. *Lockheed Aircraft Corp. v. United States*, 553 F.2d 69, 79, 213 Ct.Cl. 395 (Ct.Cl.1977) (citations omitted). Once the

claims are defined, whether the claims cover the accused device must be determined. *Envirotech Corp. v. Al George, Inc.*, 730 F.2d 753, 758 (Fed. Cir.1984).

**36.** "Equivalence, in the patent law, is not the prisoner of a formula and is not an absolute to be considered in a vacuum. It does not require complete identity for every purpose and in every respect. In determining equivalents, things equal to the same thing may not be equal to each other and, by the same token, things for most purposes different may sometimes be equivalents." *Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 609, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950).

extend from the lead body and away from the electrode tip forming an acute angle with the lead body. The tine means could only be intended to cooperate with heart tissue to hold the electrode tip in position. The tine means are made of a material, silicone rubber, inert to body fluids, which is sufficiently rigid to maintain the acute angle of the tine means in relation to the lead body when unrestrained, yet sufficiently pliant to prevent penetration or perforation of heart tissue. The Court finds that Claim 1 of the '501 patent clearly reads on the accused Daig ventricular silicone tined lead. The Daig ventricular silicone tined lead literally infringes Claim 1 of the '501 patent.

Daig contends, however, that the ventricular silicone tined lead does not infringe Claim 1 of the '501 patent. Daig makes the point that its tined lead does not have tine means *per se*, which are sufficiently rigid and pliant because of the physical properties of the material from which they are made, but rather has fins which are sufficiently rigid and pliant because of the structure of the fins. Daig also makes the point that its tined lead does not operate in the same manner as Claim 1 because, rather than moving up or down, towards or away from the lead body, its fins wrap around the lead body. The Court has considered Daig's points and finds them, to some extent, to be makeweight. The Court believes that the tines or fins of the Daig ventricular silicone tined lead are sufficiently rigid and pliant because of the material from which they are made, and operate in the same manner as the tines described in Claim 1. The Court remains convinced that the Daig ventricular silicone tined lead literally infringes Claim 1 of the '501 patent. To the extent, however, that Daig's points may not be makeweight and may serve to defeat literal infringement, the Court finds that this Daig endocardial lead performs substantially the same function in substantially the same way to obtain the same result as the Claim 1 device, and, therefore, infringes Claim 1 under the doctrine of equivalents.

The Daig urethane tined wedge lead (PX 60) is an endocardial lead which has a plurality (3) of nonconducting tine means located near the electrode tip. The tine means extend from the lead body and away from the electrode tip forming an acute angle with the lead body. The tine means are intended to cooperate with heart tissue to hold the electrode tip in position. The tine means are made of a material, urethane, inert to body fluids, which is sufficiently rigid to maintain the acute angle of the tine means in relation to the lead body when unrestrained, yet sufficiently pliant to prevent penetration or perforation of heart tissue. The Court finds that Claim 1 of the '501 patent clearly reads on the accused Daig urethane tined wedge lead. The Daig urethane tined wedge lead literally infringes Claim 1 of the '501 patent.

Daig argues, however, that the urethane tined wedge lead does not infringe Claim 1 of the '501 patent because the tines are an integral part of the wedge tip, not the lead body, and extend from the wedge tip, not the lead body. The Court has considered Daig's arguments and finds that the wedge tip is part of the encasing material of the lead body and that the tines extend from the lead body in the manner described in Claim 1. The urethane tined wedge lead, over Daig's arguments, literally infringes Claim 1 of the '501 patent. If, however, the wedge tip were not considered to be part of the encasing material of the lead body so as to defeat literal infringement, the Court would still find that the Daig urethane tined wedge lead infringes Claim 1 of the '501 patent under the doctrine of equivalents because it performs substantially the same function in substantially the same way to obtain the same result as the Claim 1 device.

The Daig atrial J silicone tined lead (PX 58) and urethane atrial J tined lead (PX 62) are endocardial leads which have a plurality (3) of nonconducting tine means located adjacent or near the electrode tip. The tine means extend from the lead body and away from the electrode tip forming an acute angle with the lead body. The tine means are intended to cooperate with heart tissue to hold the electrode tip in position. The tine means are made of a material, silicone

rubber or urethane, inert to body fluids, which is sufficiently rigid to maintain the acute angle of the tine means in relation to the lead body when unrestrained, yet sufficiently pliant to prevent penetration or perforation of heart tissue. The Court finds that Claim 1 of the '501 patent clearly reads on the accused Daig atrial J silicone tined lead and urethane atrial J tined lead. The atrial J silicone tined lead and urethane atrial J tined lead literally infringe Claim 1 of the '501 patent. Even if the Court could not find that the Daig atrial J silicone tined lead and urethane atrial J tined lead literally infringe Claim 1, the Court would find that these Daig devices infringe Claim 1 under the doctrine of equivalents because they clearly perform substantially the same function in substantially the same way to obtain the same result as the Claim 1 device.

The Court is satisfied that Medtronic has carried its burden of showing by a preponderance of the evidence that the accused Daig devices infringe Claim 1 of the '501 patent. The accused Daig devices, which include the Daig ventricular silicone tined lead (PX 56), the Daig atrial J silicone tined lead (PX 58), the Daig urethane tined wedge lead (PX 60), and the Daig urethane atrial J tined lead (PX 62), each literally infringe Claim 1 of the '501 patent. Even if the accused Daig leads did not literally infringe, the devices would infringe Claim 1 under the doctrine of equivalents because the devices perform substantially the same function in substantially the same way to obtain the same result as the Claim 1 device.

*Pacesetter Tined Endocardial Leads*

Medtronic offered eight Pacesetter tined endocardial leads as accused devices falling clearly within Claim 1 of the '501 patent. The accused devices include Pacesetter Models 817 (PX 111), 819 (PX 113), 829 (PX 115), 833 (PX 117), 851 (PX 119), 853 (PX 121), 865 (PX 123), and 869 (PX 125). Pacesetter stipulated that if these accused devices were found to infringe Claim 1, then certain other related devices which Pacesetter sold would also infringe Claim 1. Consequently, if Pacesetter Model 817 is found to infringe, then Models 818 and 818A infringe; if Model 819 is found to infringe, then Models 820 and 825 infringe; if Model 833 is found to infringe, then Model 841 infringes; and if Model 865 is found to infringe, then Models 866 and 867 infringe, as well.

Pacesetter also stipulated that the testimony of William McArthur, the current Director of Leads Products for Pacesetter, with respect to Model 817 would be the same with respect to all other Pacesetter tined endocardial leads in evidence. McArthur stated that Model 817, which Pacesetter purchased from Daig, is an endocardial lead having an electrical conductor, which is encased in a material inert to body fluids, terminating at an exposed electrically conductive electrode tip. McArthur also stated that Model 817 has nonconducting tine means which extend from the encasing material of the lead body and away from the electrode tip forming an acute angle with the encasing material. The tine means of Model 817 positioned relative to the electrode tip, McArthur admits, will cooperate with heart tissue to hold the electrode tip in position. The tine means of Model 817, McArthur further admitted, are made of a pliant material inert to body fluids which has sufficient rigidity to maintain an acute angle when the tine means are unrestrained, but sufficient pliancy to prevent penetration of heart tissue. McArthur, however, would not readily admit that the tine means of Model 817, or any other Pacesetter tined endocardial lead, were adjacent to the electrode tip. While he would say that the tine means were close to the tip, he would not say that the tine means were adjacent to the tip.

McArthur's reluctance to admit that the tine means of Model 817 were adjacent to the electrode tip was perhaps an attempt to prevent Claim 1 from reading on Model 817. The Court, however, believes that McArthur's position with respect to tine means adjacent to the electrode tip amounts to semantic quibbling. Reading Claim 1 of the '501 patent in ordinary and reasonable manner, and looking at Model 817, the Court finds that not only are the tine means of Model 817 close to and near

the electrode tip, but the tine means of Model 817 are also adjacent to the electrode tip.

The Court has carefully examined the testimony and exhibits relating to the Pacesetter tined endocardial leads, including Models 817, 819, 829, 833, 851, 853, 865, and 869. These Pacesetter devices are endocardial leads which have nonconducting tine means located adjacent or close to the electrode tip. The tine means of these devices extend from the lead body and away from the electrode tip forming an acute angle with the lead body. The tine means are intended to cooperate with heart tissue to hold the electrode tip in position. The tine means are made of a material inert to body fluids which is sufficiently rigid to maintain the acute angle of the tine means in relation to the lead body when unrestrained, yet sufficiently pliant to prevent penetration or perforation of heart tissue. The Court finds that Claim 1 of the '501 patent clearly reads on the accused Pacesetter devices, Models 817, 819, 829, 833, 851, 853, 865, and 869. Pacesetter Models 817, 819, 829, 833, 851, 853, 865, and 869 literally infringe Claim 1 of the '501 patent. Having found these Pacesetter devices to have infringed, in accordance with Pacesetter's stipulation, the Court finds that Pacesetter Models 818, 818A, 820, 825, 841, 866 and 867 also literally infringe Claim 1 of the '501 patent. Even if the Court could not find that the Pacesetter tined endocardial leads literally infringe Claim 1, the Court would find that the Pacesetter devices infringe Claim 1 under the doctrine of equivalents because they clearly perform substantially the same function in substantially the same way to obtain the same result as the Claim 1 device.

The Court is satisfied that Medtronic has carried its burden of showing by a preponderance of the evidence that the accused Pacesetter devices infringe Claim 1 of the '501 patent. The accused devices, which include, by offer at trial and stipulation, Pacesetter Models 817, 818, 818A, 819, 820, 825, 829, 833, 851, 853, 865, 866, 867, and 869, each literally infringe Claim 1 of the '501 patent. Even if the accused Pacesetter devices did not literally infringe, the devices, because they perform substantially the same function in substantially the same way to obtain the same result as the Claim 1 device, would infringe under the doctrine of equivalents.

## CONCLUSION

The Court has given its careful and detailed attention to the witnesses and evidence presented, and the numerous legal issues raised in this action. The Court remains unpersuaded that Claim 1 of the '501 patent was anticipated under § 102, that the invention disclosed in the '501 patent was obvious under § 103, and that specification of the '501 patent does not enable or set forth the best mode, or that Claim 1 of the '501 patent lacks definiteness under § 112. Daig and Pacesetter have failed to persuade the Court of the invalidity of the '501 patent by clear and convincing evidence. The Court, therefore, continues to accept the '501 patent as valid.

The Court, however, is persuaded that Claim 1 of the '501 patent was infringed literally, and, in the alternative, under the doctrine of equivalents. The Court is satisfied that the accused Daig devices, which include the Daig ventricular silicone tined lead, the Daig atrial J silicone tined lead, the Daig urethane tined wedge lead, and the Daig urethane atrial J tined lead, and the accused Pacesetter devices, which include Models 817, 818, 818A, 819, 820, 825, 829, 833, 851, 853, 865, 866, 867, and 869, infringe Claim 1 of the '501 patent. Medtronic has persuaded the Court by a preponderance of the evidence that the accused Daig and Pacesetter devices infringe Claim 1 of the '501 patent.

## ORDER

**IT IS ORDERED, ADJUDGED AND DECREED:**

1. Medtronic, Inc. and Medtronic Puerto Rico, Inc. are, by assignment, the sole and lawful owners of United States Patent No. 3,902,501.

**1542**

2. United States Patent No. 3,902,501 is valid and enforceable against Daig Corporation and Pacesetter Systems, Inc., now Siemens-Pacesetter, Inc.

3. The manufacture, distribution, sale, and use by Daig Corporation of its accused devices, the ventricular silicone tined lead, the atrial J silicone tined lead, the urethane tined wedge lead, and the urethane atrial J tined lead, have infringed Claim 1 of United States Patent No. 3,902,501 in violation of 35 U.S.C. § 271(a).

4. The manufacture, distribution, sale, and use by Pacesetter Systems, Inc., now Siemens-Pacesetter, Inc., of its accused devices, Models 817, 818, 818A, 819, 820, 825, 829, 833, 851, 853, 865, 866, 867, and 869, have infringed Claim 1 of United States Patent No. 3,902,501 in violation of 35 U.S.C. § 271(a).

5. The manufacture, distribution, sale, and use by Daig Corporation, its officers, directors, employees, agents, and all others acting in concert with it or through them, of the ventricular silicone tined lead, the atrial J silicone tined lead, the urethane tined wedge lead, the urethane atrial J tined lead, and any other tined endocardial lead embodying the elements of Claim 1 of United States Patent No. 3,902,501 are permanently enjoined.

6. The manufacture, distribution, sale, and use by Pacesetter Systems, Inc., now Siemens-Pacesetter, Inc., its officers, directors, employees, agents, and all others acting in concert with it or throuqh them, of Models 817, 818, 818A, 819, 820, 825, 829, 833, 851, 853, 865, 866, 867, 869, and any other tined endocardial lead embodying the elements of Claim 1 of United States Patent No. 3,902,501 are permanently enjoined.